UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| C.D., by and through her PARENTS AND NEXT FRIENDS, M.D. and P.D. And M.D. and P.D., for themselves,<br><br>Plaintiffs<br><br>v.<br><br>NATICK PUBLIC SCHOOL DISTRICT,<br><br>TIMOTHY M. LUFF,<br>Assistant Superintendent,<br>Natick Public School District<br><br>BARBARA MOLINARI-BATES,<br>Evaluation Team Leader,<br>Natick Public School District<br><br>And<br><br>BUREAU OF SPECIAL EDUCATION APPEALS,<br><br>Defendants | CIVIL ACTION NO. 19-<br><br>**COMPLAINT** |

The Plaintiff, C.D. ("C.D."), by and through her parents, M.D. and P.D. ("Mr. D." and "Mrs. D." individually; "Parents," collectively), and by the undersigned counsel, hereby file this Complaint against the Natick Public School District ("Natick" or "District"), Timothy M. Luff ("Mr. Luff"), Assistant Superintendent, Natick Public School District, Barbara Molinari-Bates, ("Ms. Molinari-Bates"), Evaluation Team Leader, Natick Public School District, and allege and state as follows:

**INTRODUCTION**

This is a complaint for judicial review of a final Decision of the Defendant, Bureau of Special Education Appeals ("BSEA"), an independent subdivision of the Division of Administrative Law Appeals, pursuant to 20 U.S.C. §1415(i)(2) of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1401 *et seq.;* 42 U.S.C. §1983 ("Section 1983"), Section 504 of the Rehabilitation Act of 1973, ("Section 504"), 29 U.S.C. §794; and M.G.L. c. 71B and c. 30A. Plaintiffs by and through their counsel filed for an administrative due process hearing pursuant to the IDEA on June 12, 2017. A hearing was held on June 26, 2018, and May 15, 16, and 17, 2019 at the Administrative Offices of the Natick Public Schools in Natick, Massachusetts, before, Hearing Officer Lyndsey Byrne, ("Hearing Officer") in the BSEA. The issues before the Hearing Officer were:

1. (a) Whether Natick's failure to propose an Individualized Education Program ("IEP") for C.D. for the 2015-2016 school year impeded the Parents' ability to participate meaningfully in educational planning for C.D.?

(b) Whether Natick's failure to propose an IEP for C.D. for the 2015-2016 school year caused substantive educational harm for which C.D. is entitled to compensatory services?

2. (a) Whether Natick impeded the Parents' ability to participate meaningfully in the Team meeting held on September 26, 2016?

(b) Whether the September 2016-September 2017 IEP proposed by Natick was reasonably calculated to provide a free appropriate public education ("FAPE") to C.D. in the least restrictive environment ("LRE")?

(c) If not, whether C.D. is entitled to compensatory relief?

3. (a) Whether Natick impeded the Parents' ability to participate meaningfully

in the Team meeting held on February 14, 2017.

(b) Whether the February 2017-February 2018 IEP proposed by Natick was reasonably calculated to provide C.D. with FAPE in the LRE?

(c) If not, whether C.D. is entitled to compensatory relief?

4. (a) Whether Natick prevented the Parents from participating meaningfully in the Team meeting held on May 10, 2017?

(b) Whether the 2017-2018 IEP proposed by Natick was reasonably calculated to provide C.D. with FAPE in the LRE?

(c) If not, whether C.D. is entitled to compensatory relief?

5. (a) Whether Natick impeded the Parents' ability to participate meaningfully in the Team meeting held on October 31, 2017?

(b) Whether the 2017-2018 IEP proposed by Natick was reasonably calculated to provide C.D. with FAPE in the LRE?

(c) If not, whether C.D. is entitled to compensatory relief?

6. (a) Whether Natick impeded the Parents' ability to participate meaningfully in the Team meeting held on February 6, 2018?

(b) Whether the 2018-2019 IEP proposed by Natick was reasonably calculated to provide C.D. with FAPE in the LRE?

(c) If not, whether C.D. is entitled to compensatory relief?

7. (a) Whether the final IEP proposed by Natick, covering the period February 2019 through the date of C.D.'s 22nd birthday in March 2019, was reasonably calculated to provide C.D. with FAPE in the LRE?

(b) If not, whether C.D. is entitled to compensatory relief?

On July 15, 2019, to preserve the Parents' rights and for the purpose of administrative exhaustion to the extent required by law, the Parents filed a post-hearing motion for leave to amend their request for hearing pursuant to F.R.C.P. Rule 15(b), by adding claims for relief under Section 504 and Section 1983, to conform to the evidence entered and presented at the hearing on May 15, 16, and 17, 2019. In support of their motion, the Parents referenced the testimony presented by Mr. Luff and Ms. Molinari-Bates during the hearing which revealed evidence, previously unknown to the Parents, supporting claims for retaliation and discrimination in violation of Section 504 and Section 1983.

On July 24, 2019, the Hearing Officer denied the Parents' motion, finding that Natick's testimony did not present sufficient or new evidence at the hearing to warrant the Parents' motion, thereby exhausting the Parents' administrative remedies with regard to these additional claims.

The Hearing Officer issued her decision on August 29, 2019, setting forth the following findings and orders (attached hereto as Exhibit A):

(1) The Parents proved by a preponderance of the evidence that Natick violated their IDEA rights to meaningful participation in the development of a 2015-2016 IEP for C.D. As equitable compensation for the procedural violation, Natick shall, within 90 days of the date of the Decision, reimburse the Parents for tuition they paid to Learning Prep School in connection with C.D.'s attendance there during the 2015-2016 school year.

(2) The Parents have not met their burden of proving by a preponderance of the evidence the existence of any other alleged procedural violation which might warrant relief; and

(3) The Parents have not met their burden of proving by a preponderance of the evidence that the IEPs proposed by Natick for the 2016-2017, 2017-2018 and 2018-2019

school years were not reasonably calculated to provide C.D. with a FAPE. Therefore, the Parents' request for additional relief is denied.

The Plaintiffs bring this action timely, seeking review and reversal of the H.O.'s decision with respect to: (1) whether there were any other procedural violations committed by Natick that resulted in a denial of FAPE to C.D.; (2) whether Natick failed to provide C.D. with FAPE in the LRE for the 2016-2017, 2017-2018 and 2018-2019 school years; and (3) whether actions of Natick, Defendant Luff and Defendant Molinari-Bates violated C.D.'s rights under Section 504 and Section 1983, as they apply to C.D., a person with a disability, as defined by applicable federal and state regulations.

The Parents are seeking reimbursement for tuition, costs and expenses incurred through their unilateral placement of C.D. at Learning Preparatory School ("Learning Prep") in Newton, Massachusetts for the 2016-2017 and 2017-2018 school years; reimbursement for other privately obtained educational tutoring services, including during the school years and summers; reimbursement for the tuition, costs and expenses incurred through their enrollment of C.D. at the Cosmix School of Beauty Sciences ("Cosmix") from October 2017 through May 2019; provision of compensatory educational services focused on the Math MCAS, either in the form of supplemental tutoring and coordination with the Massachusetts Department of Education to either ensure that C.D. is permitted to sit for the exam in Natick, or by working with the Superintendent of Natick, and any other agencies/educational institutions necessary to obtain documentation for C.D. to submit a performance appeal, as well as reasonable attorney's fees and costs under the IDEA, in addition to damages under Section 504 and Section 1983 for intentional discrimination and retaliatory conduct , including, but not limited to, expert witness fees, and other fees, costs and expenses.

The Parents are aggrieved by the final decision of the Hearing Officer in that it is based upon mistakes of fact and errors of law, made upon unlawful procedures, not supported by a preponderance of the evidence, unwarranted by the facts on the record, biased, arbitrary and capricious, an abuse of discretion and otherwise not in accordance with applicable law.

## JURISDICTION AND VENUE

1. This action arises under the IDEA, 42 U.S.C. 1401 *et seq.;* Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, and 42 U.S.C. §1983. Jurisdiction is conferred upon the Court by 28 U.S.C. §1331, 20 U.S.C. §1415(i); 20 U.S.C. 28 U.S.C. §1343(a) (3) and (4).

2. Venue is proper in this District, pursuant to 28 U.S.C. §1391(b), because a substantial portion of the events or omissions giving rise to the Plaintiffs' claims occurred in this District, Defendants reside, transact business, and have agents in this District.

## THE PARTIES

3. The Plaintiff, C.D. is the subject of this action. She is a student with a disability who is entitled to all the rights, entitlements, and procedural safeguards mandated by applicable law and statutes, including, but not limited to, the IDEA, Section 504, Section 1983, and M.G.L. c.71B. C.D. is and was at all times relevant to this action, a resident of Natick, Middlesex County, Massachusetts.

4. The Plaintiffs, M.D. and P.D. are C.D.'s father and mother respectfully, who bring this action on behalf of C.D. and themselves. M.D. and C.D. are and were at all times relevant to this action, residents of Natick, Middlesex County, Massachusetts.

5. The Defendant, Natick, is a public corporation with the capacity to be sued under the laws

of the Commonwealth of Massachusetts, with a usual place of business located at 13 E. Central Street, Natick, Middlesex County, Massachusetts.

6. Natick receives federal funds from the United States Department of Education pursuant to the IDEA, and is required to provide special education services to all eligible students who reside within the school district.

7. The Defendant, Mr. Luff, is the Assistant Superintendent of Student Services for the Natick Public Schools. As such, Mr. Luff is responsible for the administration of education, both regular and special education, in both elementary and secondary settings, located in Natick, Middlesex County, Massachusetts. He is sued in his official capacity.

8. The Defendant, Ms. Molinari-Bates, is the Evaluation Team Leader for special education at Natick High School (Grades 10-12) and the post-secondary "ACHIEVE" program. As such, Ms. Molinari-Bates is responsible for coordinating all initial evaluations and reevaluations, providing quality assurance for all IEPs and annual reviews, serving as the district liaison, maintaining a working knowledge of special education laws, policies and procedures, and providing guidance to team members relative to the provision of services to students located in Natick, Middlesex County, Massachusetts in accordance with the IDEA. She is sued in her official capacity.

9. The Defendant, BSEA, is an independent subdivision of the Division of Administrative Law Appeals, an independent state agency within the Commonwealth of Massachusetts, with a usual place of business at One Congress Street, Boston, Suffolk County, Massachusetts.

10. The BSEA is responsible for adjudicating disputes between parents and school districts regarding special education services pursuant to 20 U.S. §1415(g) and M.G.L. c. 71B, §2A.

## STATEMENT OF FACTS

## EDUCATIONAL HISTORY

11. C.D. is a twenty-two (22) year old woman with a disability who was eligible for special education and related services under federal law through age twenty-one (21), and under state law through age twenty-two (22).

12. The Parents were appointed limited permanent guardianship over C.D. on April 13, 2016.

13. C.D. has been diagnosed with a mild intellectual disability, along with deficits in receptive and expressive language.

14. C.D. has many strengths, including, but not limited to, a very strong work ethic and excellent executive functioning skills; she is organized, motivated, goal-oriented, and cooperative; has good social skills, and has never exhibited any behavior problems.

### Natick Public School District

15. C.D. attended public school in Natick through the end of 5th grade pursuant to IEP's proposed by Natick and accepted by the Parents.

16. Natick proposed an IEP for 6th grade placing C.D. in the substantially separate ACCESS program for all of her academic classes during the 2009-2010 school year.

17. The ACCESS program at Wilson Middle School is a self-contained substantially separate "life-skills" program that uses "entry points" to access the general education curriculum, emphasizing functional academics and community living skills.

18. On or about September 2009, the Parents rejected the proposed IEP and enrolled C.D. in the Christa McAuliffe Regional Charter Public Middle School ("McAuliffe"), in Framingham, Massachusetts.

**McAuliffe (2009-2012)**

19. C.D. attended all of her classes at McAuliffe integrated with general education students in the inclusion setting with appropriate supports and services for 6th grade through 8th grade (with the exception of Math in 8th grade, for which she attended a small group class).

20. C.D. advanced from grade to grade at McAuliffe alongside her general education peers and passed the Massachusetts Comprehensive Assessment System ("MCAS") exam in English Language Arts ("ELA") in 8th grade.

21. C.D.'s program at McAuliffe provided her with challenging goals in light of her unique needs and individual circumstances, enabling her to obtain meaningful educational and social benefits.

22. On or about May 2, 2012, the Parents contacted Natick to request an IEP Team Meeting to discuss C.D.'s potential re-enrollment in Natick for 9th grade following her graduation from McAuliffe.

23. The Parents' indicated that their vision for C.D. was for her to continue to access the Massachusetts Curriculum Frameworks and progress in the general education setting to the maximum extent appropriate so she could prepare for the MCAS exam and obtain a high diploma.

24. Natick proposed an IEP for 9th grade placing C.D. in the substantially separate ACCESS program at Natick High School for all of her academic classes during the 2012-2013 school year.

25. The ACCESS program at Natick High School is a self-contained substantially separate life-skills program that uses entry points to access the general education curriculum, emphasizing functional academics and community living skills.

26. The ACCESS program does not prepare students to take the standard MCAS exam and receive a high school diploma.

**Learning Prep (2012-2018)**

27. On or about September 2012, the Parents rejected Natick's proposed IEP and provided Natick with notice of their intent to unilaterally place C.D. at Learning Prep in Newton, Massachusetts.

28. Learning Prep is a Massachusetts Department of Education ("MDOE") approved private day school for students with learning and language disabilities, which follows the Massachusetts Frameworks Curriculum and prepares all students to reach state graduation requirements and participate in the MCAS examinations consistent with the mandates of the Department of Elementary and Secondary Education ("DESE").

29. Students from Learning Prep who complete the state graduation requirements and pass the MCAS examinations in ELA, Science/Technology and Math are eligible to receive a high school diploma from their home school district.

30. Approximately eighty-five percent (85%) of students at Learning Prep pass the MCAS exams and receive high school diplomas.

31. C.D. continued to attend Learning Prep on the diploma track for all four years of high school, following the Parents' rejection of Natick's proposed IEPs which would not have provided her with the opportunity to meet all state graduation requirements and pass all MCAS exams.

32. While at Learning Prep, C.D. met all her course credit graduation requirements, passed the standard ELA and Science/Technology MCAS exams and missed passing the Math MCAS exam by four (4) points.

33. While at Learning Prep, C.D. obtained her learner's permit and driver's license, passing both the written test and the road test without accommodations.

34. During her 12th grade year, C.D. was admitted into Learning Prep's Work Study and Transitional Guidance Program ("Work-Study Program"), which provides eligible students with the opportunity to attend work and school on alternating weeks, managing 25 hours of off-campus employment (either paid or volunteer) each work-week along with out-of-class academic assignments.

35. During their work-week, students go to school in the morning and are transported to their worksites, where they spend approximately five (5) hours per day five (5) days per week, then return to school at the end of each day to communicate with their teachers.

36. On Fridays, prior to their work-week, students are given homework packets to complete independently throughout the week to be handed in when they return for their academic study-week the following Monday.

37. During their study-week, students attend classes, which includes their 4th year of a Consumer Skills course twice per week and their 2nd year of a Career Education course three times per week, along with other academic courses, which follow the Massachusetts Curriculum Frameworks and prepare all students to take and pass the standard MCAS exams.

38. The Consumer Skills course focuses on daily living skills, including cooking, budgeting, food shopping and cooking actual meals in the Learning Prep kitchens, in addition to an annual field trip to the Natick Mall, where students are required to dress appropriately, obtain and complete job applications from vendors, and bring money to purchase their own lunches.

39. The Career Education course focuses on job-related "soft" skills, including, interviewing skills, completing job-related forms, and exploring areas of career interest.

40. C.D. chose to remain at Learning Prep for the 2016-2017 school year.

41. Students who choose to remain at Learning Prep for a 5th year continue to participate in the Work-Study program, which includes the course subjects that they attended in their 4th year, including the Consumer Skills course and Career Education course but with different content and vocational experiences designed to increase their independence.

42. While attending Learning Prep's Work-Study program, C.D. successfully completed multiple volunteer/internship experiences, including placements at CoBella Salon, Asera Care Hospice, Evolving Closet Consignment Shop, Mother's Milk Bank, Marshall's, the Natick Service Council, and the Learning Prep Childcare Center.

43. During the summer of 2016, C.D. participated in the Summer-Work program, where rising seniors have the opportunity to work at Newton-Wellesley hospital.

44. C.D's longstanding vision was to attend a post-high school vocational program and obtain a license in Cosmetology, which required her to obtain a high school diploma.

45. While at Learning Prep, C.D. continued to prepare for the Math MCAS exam so that she could pursue her vision.

46. C.D. participated in an Integrated Geometry/Algebra course targeted towards preparation for the Math MCAS, but did not take a full course in Algebra I.

47. In May 2017, C.D. completed her program at Learning Prep, which provided her with challenging goals in light of her unique needs and individual circumstances, enabling her to obtain meaningful educational, vocational, and social benefits.

**Cosmix (2017-2019)**

48. In October 2017, C.D. enrolled in Cosmix, a post-high school vocational school in Marlboro, Massachusetts, with flexible scheduling that provides both classroom instruction and hands-on experiences in preparation for careers in the beauty industry.

49. Students must successfully complete one-thousand (1000) hours in the Cosmetology program to be eligible to take the licensing exam.

50. Although a high school diploma is not required to enroll in Cosmix, students must be working towards a high school diploma to enroll in Cosmix and participate in the licensing exam.

51. C.D. attended Cosmix Mondays-Thursdays, in a general education environment without any supports and services, alongside almost all non-disabled peers.

52. C.D. drove herself 45 minutes back and forth each day to attend the program.

53. While at Cosmix, C.D. worked on actual clients on a daily basis.

54. While at Cosmix, C.D.'s vocational and community-based instruction included, participation in field trips to salons in the community, choosing and purchasing retail hair products on her own, learning to mix hair color formulas in appropriate proportions, reviewing potential job placements and participating in career-oriented activities, including presenting the value of her chosen products to her peers and instructors using the language or Cosmetology.

55. While at Cosmix, C.D. established relationships with her peers and demonstrated her increasing independence and adult living skills, including by driving one of her peers home on multiple occasions, and by going to Dunkin Donuts on her own to purchase food and drinks requested by her peers.

56. To obtain a high school diploma, C.D. needed to score four (4) additional points on the MCAS Math exam, which the Parents had confirmed required that she only needed to

answer four additional multiple-choice questions correctly or one additional open-response question correctly to pass.

57. While at Cosmix, C.D. continued to prepare for the Math MCAS exam so that she could pursue her vision.

58. In May 2019, C.D. successfully completed one-thousand (1000) hours in the Cosmetology program at Cosmix, which provided her with challenging goals in light of her unique needs and individual circumstances, and enabled her to obtain meaningful educational, vocational, and social benefits consistent with her potential, while pursuing her vision of becoming a Cosmetologist.

**Due Process Hearing 2014**

59. Approximately five (5) years earlier, on May 23, 2014, the Parents filed a request for due process hearing with the BSEA, alleging that Natick violated C.D.'s due process rights under the IDEA by: (1) failing to propose IEP's for the 2012-2013, 2013-2014, and 2014-2015 school years that provided C.D. with a FAPE in the LRE; and (2) committing multiple procedural violations that resulted in the denial of a FAPE.

60. On May 12, 13, 27, and 28, 2015, a hearing was held before the BSEA.

61. On July 28, 2015, the BSEA issued its final decision, finding that: (1) the IEPs proposed for C.D. provided her with a FAPE in the LRE; and (2) Natick did not commit any procedural violations that resulted in the denial of a FAPE.

62. The Parents appealed the hearing decision, which was affirmed by the Massachusetts District and First Circuit Courts, and is now pending appeal to the United States Supreme Court via a petition for certiorari filed in August 2019.

63. During the second day of the hearing on May 13, 2015, the parties agreed to postpone C.D.'s annual review due in June 2015 until after the hearing decision was reached.

**June 2015 - June 2016**

64. Natick failed to reconvene the Team for C.D.'s Annual Review following expiration of her IEP, and failed to propose any IEP for the 2015-2016 school year.

65. Having no opportunity to consider a Natick IEP prior to the start of the 2015-2016 school year, the Parents continued C.D.'s placement at Learning Prep for 12th grade.

66. Based upon the evidence submitted by the Parents together with the testimony presented at the hearing, the Hearing Officer found that the Parents carried their burden of proving by a preponderance of the evidence that Natick impeded the Parents' right to participate in educational planning for C.D. during the 2015-2016 school year, causing her substantive harm and entitling her to compensatory relief.

67. The Hearing Officer ordered that, within ninety (90) days of the date of the Decision, Natick shall reimburse the Parents for the tuition paid to Learning Prep in connection with C.D.'s attendance during the 2015-2016 school year.

**June 2016 - August 2016 IEP**

68. In June 2016, approximately one year after C.D.'s previously proposed IEP expired, Natick realized that it had failed to propose an IEP for C.D. for the entire 2015-2016 school year.

69. In June 2016, Ms. Molinari-Bates asked Mr. Luff to look into the matter.

70. On or about June 23, 2016, Ms. Molinari-Bates received an email from her administrative assistant indicating that C.D had presumably graduated from Learning Prep but that Mr. Luff was still trying to figure that out.

71. On June 27, 2016, Mr. Luff sent an email to Ms. Molinari-Bates indicating that:

> Although we won the hearing back in July 15, we were still required to hold an IEP meeting for her to propose for the 15-16 school year. The most recent IEP expired in [June] of 2015, which means she has been without a proposal for more than a year. We will need to hold an IEP team meeting ASAP in order to propose a plan for this coming school year. If we cannot do this until September, then so be it, but we will want to get on it immediately when the school year begins.

72. On August 15, 2016, Ms. Molinari-Bates sent a Meeting Invitation to the Parents proposing a meeting in September 2016 for C.D.'s annual review.

73. The Parents completed and returned the forms enclosed with the Meeting Invitation, including an authorization for Natick to obtain C.D.'s records from Learning Prep.

74. On the Student Questionnaire, C.D. indicated that her primary career interest was Cosmetology and that the area she wanted to improve was Math.

75. On the Parent Questionnaire, Mr. D. indicated that C.D.'s areas of significant interest were cosmetics and hair care, that his concerns about her educational progress were passing MCAS and obtaining a high school diploma; his primary goal for the current school year was for her to pass the MCAS exam.

76. On or before June 27, 2016, both Ms. Molinari-Bates and Mr. Luff were fully aware that Natick was responsible for providing C.D. with an IEP and had failed to do so for the entire 2015-2016 school year.

77. On or before June 27, 2016, both Ms. Molinari-Bates and Mr. Luff were fully aware that if a

meeting was not scheduled before September 2016, C.D. would not have an IEP in place prior to the start of the 2016-2017 school year.

78. Ms. Molinari-Bates, acting in her official capacity, intentionally neglected to contact the Parents until August 15, 2016, at which time she sent a Meeting Invitation to the Parents proposing a meeting in September 2016 for C.D.'s Annual Review.

79. Ms. Molinari-Bates testified that she waited until mid-August 2016 to contact the Parents because that is what she was asked to do by Mr. Luff, and as the Evaluation Team Leader, she does not schedule summer meetings.

80. Mr. Luff testified that while it might have been possible for Natick to schedule an IEP meeting in the summer, his decision to delay notifying the Parents and scheduling a meeting before September was based upon the Parents' request for a due process hearing in 2014, which had included, "question[ing] the team composition in July 2012."

81. Mr. Luff, acting in his official capacity, admitted under oath that he intentionally decided to postpone the IEP meeting until after the 2016-2017 school year began, while knowing that doing so would preclude the Parents from deciding whether to return C.D. to Natick prior to the start of the 2016-2017 school year.

82. Having no opportunity to consider an IEP proposed by Natick prior to the start of the 2016-2017 school year, the Parents continued their placement of C.D. for an additional year in Learning Prep's Work Study program.

**September 29, 2016 Meeting**

83. On September 29, 2016 an IEP meeting was held by teleconference, more than fourteen (14) months since the expiration of the previously proposed IEP dated June 14, 2014-June 13, 2015, and approximately one (1) month after C.D. began attending her 2nd year in Learning Prep's Work-

Study program.

84. At the time of the meeting in September 2016, C.D. had participated in a full year of Learning Prep's Work-Study program; had successfully completed the Consumer Skills course at Learning Prep (twice per week for the previous four (4) years); and had participated in the Career Education course at Learning Prep (three (3) times per week for the previous two (2) years.)

85. At the time of the meeting in September 2016, C.D. had passed the ELA MCAS and was awaiting the results of her most recent retake exam in Science/Technology.

86. There was no representative from Learning Prep in attendance at the meeting and there was no one in attendance from Natick who had worked with C.D. directly or indirectly, observed her or spoken with her service providers since 2014.

87. The Parents indicated that their vision for C.D. at Natick High School would be a continuation of the preparation she has made toward obtaining a high school diploma either by passing the Math MCAS or by applying to the Department of Education for a waiver pursuant to the MCAS appeal process, in addition to a continuation of the progress she has made acquiring and developing job skills through her volunteer/internship experiences and courses at Learning Prep during the past several years.

88. The Parents emphasized the necessity of C.D. obtaining a high school diploma so that she could pursue a post-high school education and obtain a license in the field of Cosmetology.

89. Natick was aware of C.D.'s longstanding vision to pursue a career in the field of Cosmetology, which Ms. Kathryn Brown ("Ms. Brown"), Natick's Transition Coordinator, confirmed required a high school diploma and that in order to obtain a diploma, she would need to keep working on the Science/Technology and Math MCAS exams, which she had not yet passed.

90. Within the first few minutes of the meeting, and before discussing any goals, Ms. Brown

read the Natick team's vision aloud, proposing placement in Natick Public School's post-high school ACHIEVE program for the 2016-2017 school year.

91. The ACHIEVE program at Natick High School is a self-contained post-high school transition program focused on life-skills and functional academics.

92. Following Ms. Brown's indication of the proposed placement and without discussing C.D.'s present levels of performance, Natick proceeded to read aloud the goals that they had determined prior to the meeting, which all focused on functional academics and life-skills.

93. Natick did not present any goals for Math or Science directed at preparing C.D. for the MCAS exams.

94. Natick was not open to discussing the possibility of including Math or Science goals directed towards MCAS preparation, noting that the post-high ACHIEVE program only included functional academics, because it was a vocational life-skills program.

95. Natick indicated that, as an ACHIEVE student, any MCAS preparation C.D. would receive would be through the on-line Gradpoint program which would not be included in the IEP goals or service delivery grid.

96. Natick did not explain why the on-line Gradpoint program could not be included in the IEP goals or service delivery grid, other than to note that it is a supplemental service outside of the IEP.

97. Natick indicated that they would discuss when Gradpoint would be provided after the Parents accepted the IEP.

98. Natick informed the Parents that even if C.D. passed the MCAS exams, she would only be eligible for a high school diploma if the Guidance Department determined that the course credits C.D. received at Learning Prep could be applied towards Natick High School graduation requirements.

99. Natick agreed to submit a request for a course credit audit to the Guidance Department.

100. Massachusetts law requires the school superintendent to file a performance appeal on behalf of a student with a disability upon the request of the student's parent or guardian.

101. In response to Mr. D.'s request for information regarding the possibility of C.D. applying for an MCAS appeal through the MDOE, Natick indicated that C.D. would not likely qualify for the MCAS appeal process because eligible students are typically general education students, not students in other level courses or with specialized instruction.

102. Following Natick's presentation of their proposed goals, Ms. Molinari-Bates indicated that C.D.'s 3-year re-evaluation was due in June 2017 but she would be moving it up to October 2017 for the purpose of determining C.D.'s eligibility for Extended Year Services ("ESY").

103. Ms. Molinari-Bates did not explain why she was moving C.D.'s 3-year re-evaluation up to October 2017, other than to note that she always moves re-evaluations up to March or April when they are due in June to provide time before the summer to conduct the evaluations and have a team meeting.

104. Natick proposed an updated psychological evaluation, an updated speech and language evaluation and updated achievement testing, but did not propose any updated age-appropriate transition assessments.

105. Despite Mr. D.'s request, Natick would not conduct any assessment of any kind to determine whether C.D. needed additional instruction in any of the required algebraic concepts on the MCAS exam.

106. The Parents agreed to move up C.D.'s 3-year re-evaluation and arranged for private evaluations in the areas proposed by the School District.

107. Natick indicated that while there are many transition programs available, the ACHIEVE

program was the only option being proposed because Natick believed it was the only option appropriate for C.D.

108. Ms. Molinari-Bates testified that Natick did not propose any other placement for C.D. because she had completed her high school years, and based upon her profile and her skills, Natick believed the ACHIEVE program was the only appropriate placement.

**October 2016 - October 2017 IEP**

109. Ms. Molinari-Bates testified that the ACHIEVE program was appropriate for C.D. because the goals and objectives were relevant and "welcome," but admitted there was no goal focused on preparing C.D. for the MCAS exam so she could obtain a high school diploma.

110. Mr. Luff testified that the ACHIEVE program was appropriate for C.D. because it is a comprehensive program focused on functional academics and was very similar to the ACCESS program proposed by Natick for the 2012-2013, 2013-2014, and 2014-2015 school years.

111. The Parents received the proposed IEP from Natick on September 30, 2019, which included verbatim the functional and life-skills goals that Natick proposed at the meeting on September 29, 2016, in addition to full-time (five (5) days per week) placement in the self-contained life-skills ACHIEVE program.

112. The proposed IEP did not provide C.D. with challenging objectives, disregarded her vocational classes and experience at Learning Prep for the past several years, set the bar low and essentially would have forced to regress to meet her goals.

113. The Parents rejected the IEP and attached a ten (10) page document outlining the reasons for their rejection, including that the Career Preparation goal on the proposed IEP was not based on C.D.'s current levels of performance, and omitted any reference to the updated vocational

experiences and skills C.D. obtained as part of her participation in Learning Prep's Work-Study program or the Consumer Skills and Career Education courses.

**February 2017 - Feburary 2018 Meeting**

114. On February 14, 2017, an IEP meeting was held for the purpose of C.D.'s annual review and to review the results of the evaluations.

115. Ms. Molinari-Bates testified that Natick reviewed C.D.'s transcripts from Learning Prep prior to the meetings on September 29, 2016 and February 14, 2017.

116. The evidence on the record showed that Ms. Molinari-Bates actually sent an email to Learning Prep on February 10, 2017 requesting copies of C.D.'s transcripts after June 2016, five (5) months after the meeting on September 29, 2016.

117. The evidence on the record showed that Learning Prep sent C.D.'s transcript to Natick on February 17, 2017, three (3) days after the meeting on February 14, 2017.

118. Natick informed the Parents that they had not yet asked the Guidance Department to conduct a course credit audit for C.D.

119. Mr. Mark D'Angelo ("Mr. D'Angelo"), a special education teacher at Natick High School conducted the achievement testing, but did not conduct any observations.

120. Mr. D'Angelo noted that C.D. was very different from the child he had evaluated in 2014, specifically that she was much more mature, that her personality was completely different, and that she has grown up.

121. Mr. D'Angelo reported that C.D. scored in the average range in most of the reading and writing areas, but had more difficulty in Math, especially word problems which use more language.

122. Mr. D. opined that the standardized test results do not tell the whole story.

123. Mr. D'Angelo agreed that was a fair statement.

124. Ms. Deanna Kanavas-DeRocher ("Ms. Kanavas-DeRocher"), Natick's school psychologist, conducted the Psychological testing and observed C.D. in her World Civilization class.

125. Ms. Kanavas-DeRocher noted that C.D. was engaged the whole time, interacted with the students and teacher, read out loud, and did a really great job in the class.

126. Ms. Kanavas-DeRocher agreed with Mr. D. and Mr. D'Angelo that the test scores do not provide a complete picture of C.D.'s abilities and potential, indicating that she has a lot of social/emotional skills, a lot of adaptive skills and that the social/emotional testing all came out within the average range.

127. Ms. Sarah Butterfield ("Ms. Butterfield"), Natick's speech-language pathologist conducted the speech and language evaluation, but did not conduct any situational observations.

128. Ms. Butterfield reported that with regard to C.D.'s social and interpersonal skills, she did a great job.

129. Ms. Suzanne Flax ("Ms. Flax"), who has served as C.D.'s private speech-language pathologist since 2007 and independent educational evaluator since 2010, and has observed C.D. in all of her educational settings, conducted a private speech and language evaluation, and noted that her most recent test results were similar to Ms. Butterfield's.

130. In line with the opinions of Mr. D'Angelo, Ms. Kanavas-DeRocher, and Mr. D., Ms. Flax emphasized that C.D. is a young woman who has many more skills than her test scores show.

131. Dr. Steve Imber ("Dr. Imber"), who has served as the Parents' private independent educational evaluator and special education consultant since 2009, and has observed C.D. multiple times in all of her educational settings, conducted a private psychoeducational evaluation and noted that his test results were relatively similar to his results in the past.

132. In line with the opinions of Mr. D'Angelo, Ms. Kanavas-DeRocher, and Mr. D., and Ms. Flax, Dr. Imber emphasized that C.D.'s performance on standardized tests, where she is not provided with any supplemental support, do not accurately predict her performance or potential in the classroom or the community.

133. As of the date of the February 14, 2017 meeting, in spite of her standardized test scores, C.D. had successfully completed all of the courses required for graduation, obtained her driver's license, passing both the written test and the road test without accommodations, passed the ELA and Science/Technology MCAS exams, and missed passing the Math MCAS exam by four (4) points.

134. As of the date of the February 14, 2017 meeting, the only barrier preventing C.D. from obtaining a high school diploma so that she could pursue her vision of becoming a licensed Cosmetologist was achieving four (4) additional points on the Math MCAS exam.

135. Following the presentation of the evaluation results, Ms. Molinari-Bates repeated that Natick's vision continued to be to place C.D. in the ACHIEVE program where she would access the functional life-skills curriculum.

136. With regard to supporting C.D. in reaching her goal to pass the Math MCAS, Natick again offered the on-line tutorial course Gradpoint.

137. Natick noted that Gradpoint is used for high school students to supplement the standards that are addressed in their actual geometry and algebra courses.

138. Natick admitted that using Gradpoint is difficult to do by yourself.

139. Natick offered to allow C.D. to attend the MCAS support class at Natick High School which starts the week after April vacation and meets after school at 2:30 PM.

140. Natick did not offer to provide C.D. any supplemental supports if she chose to attend the

afterschool class.

141. Mr. D. indicated that C.D. could not attend the class at 2:30 PM due to her dismissal time at Learning Prep, and regardless, it would not have been available to assist her in preparing for the MCAS retake exam in March.

142. Mr. D. asked if the proposed IEP would include an MCAS goal but Natick was not open to that, indicating that the proposed program would be focusing solely on functional math skills.

143. The District then proceeded to read their proposed functional academic and life-skills goals, which were identical to those proposed at the meeting on September 29, 2016 before the accelerated 3-year re-evaluation.

144. There were no age-appropriate transition assessments conducted since 2014.

145. The District proposed ESY services for 2 ½ hours per week for five (5) weeks during the summer of 2017, focused solely on speech and language services for 30 min per week and 2 hours per week focused solely on functional math, with no services directed towards preparing C.D. for the Math MCAS.

**February 2017 - February 2018 IEP**

146. The Parents received the proposed IEP on February 17, 2017.

147. The proposed IEP dated February 17, 2017 to February 18, 2018 included verbatim the functional academic and life-skills goals that Natick proposed at the meeting on September 29, 2016.

148. The Parents rejected the proposed IEP and attached a three (3) page document outlining the reasons for their rejection, which included that the District continued to reference as the basis for their decisions, the transition evaluation in 2014 and progress reports from April 2016, and despite having updated progress reports from Learning Prep from January of 2017, the District made no

changes to the previously proposed IEP.

149. In March 2018, Natick confirmed that C.D. had met all her course credits and would be eligible to receive a high school diploma if she passed the MCAS in Math.

**May 10, 2017 Meeting**

150. On April 10, 2018, Mr. D. sent an email to Ms. Molinari-Bates indicating that C.D. would be enrolling in Natick on June 5, 2017 for the remainder of the 2016-2017 school year and for ESY following her graduation from Learning Prep on May 26, 2017.

151. Mr. D. requested a meeting to discuss whether Natick would be willing to propose an IEP focused on Carolyn’s vision before the summer.

152. On May 10, 2017, a meeting was held where the Parents reiterated Carolyn’s need to prepare for the Math MCAS so that she could have the opportunity to achieve her post-secondary vision.

153. Natick reiterated that the IEP goals and ESY services would be focused solely on functional academics and life-skills.

154. The District offered to provide one hour of 1:1 tutoring specific to MCAS preparation beginning in the fall, but noted that it would have to take place after school or on the weekend.

155. Natick did not explain why the tutoring could not occur during the school day other than to indicate that it was a supplemental service.

156. Mr. D. asked for clarification regarding Natick’s proposed Career Preparation goal, which called for 12 hours of job shadowing per year, noting that C.D. had been working 25 hours per week on alternating weeks for the past two years as part of her Work-Study program at Learning Prep, so he did not think Natick's goal would be challenging for her.

157. Natick explained that they have job shadowing so that they could get to know C.D.

158. When the Parent's counsel asked what C.D. would be doing in June if the Parents accepted the IEP as written, Natick replied, "She's going to follow whatever the program is at that point in time."

**IEP Following May 2017 Meeting**

159. The Parents received the proposed IEP on May 17, 2017, which was essentially identical to the previous IEP, except for the addition of 1:1 MCAS Math tutoring included as a supplemental service for one (1) hour per week outside of the school day.

160. Natick never explained why one (1) hour per week was appropriate to meet C.D. individual needs.

161. The Parents rejected the IEP and placement for most of the same reasons that they had rejected the previous IEP, with some additional comments, including that the proposed supplemental Math MCAS tutoring of one (1) hour per week after school and access to the on-line Gradpoint program did not address Carolyn's individual needs and would not enable her to progress appropriately.

162. On May 18, 2017, Ms. Brown spoke with Alison Mesquitta, one of Carolyn's job coaches at Learning Prep, but chose not to observe C.D. at any of her vocational placements.

163. Ms. Brown testified that prior to May 18, 2017 she had not spoken to any of Carolyn's job coaches and had not observed C.D. in any of her vocational placements since 2014.

164. On May 24, 2017, Mr. D. informed Natick that C.D. would not be returning to Natick before the end of the school year or for ESY.

165. C.D. attended MCAS tutoring at the Commonwealth Learning Center during the summer of 2017, at the Parents' expense.

**Request for Due Process Hearing/Discovery 2017**

166. On June 12, 2017, the Parents filed a request for due process hearing to address Natick's failure to offer C.D. a FAPE in the LRE for the 2015-2016, and 2016-2017 and 2017-2018 school years through May 10, 2017 (later amended by agreement to include the remaining team meetings and IEPs proposed for the 2017-2018 and 2018-2019 years.)

167. As part of the discovery process following the Parents' request for hearing, the Parents had requested redacted weekly schedules of the students in the ACHIEVE program between July 2015 and the current date.

168. Sara Berman, the hearing officer at the time, issued a ruling in September 2017, ordering the District to provide the redacted schedules subject to conditions designed to protect the confidentiality of the other students.

169. Approximately thirty-six (36) weekly schedules were made (for each of the two (2) school years) between the date of the ruling and the date of the hearing in June 2018.

170. Despite the BSEA ruling, Natick had only provided one (1) weekly schedule to the Parents at the time of the hearing.

**Prehearing Conference and Interim Settlement Agreement (August 2017)**

171. At the prehearing conference held on August 7, 2017, the Parents indicated that C.D. needed to have an IEP in place for the start of the 2017- 2018 school year and tutoring services in preparation for the Math MCAS exam in November, but that they did not believe the IEP proposed for Natick was appropriate for all of the reasons indicated in their multi-page attachments to each of their rejections between September 2016 and May 2017.

172. Natick indicated that they did not have sufficient information to propose an appropriate IEP

for C.D., and proposed an extended evaluation, to obtain information regarding C.D.'s current vocational soft skills and interests.

173. Natick required that the extended evaluation occur at the ACHIEVE program and that the Parents agree to implement the IEP that they had just rejected.

174. As part of the settlement negotiations, the Parents had asked for the District to include five (5) hours of MCAS tutoring, one (1) hour per day, and to include an assessment of Carolyn's algebra and geometry skills as part of the evaluation.

175. Natick agreed to provide three (3) hours of MCAS tutoring, but only if it was scheduled after the school day or on weekends.

176. Natick refused to include an assessment of Carolyn's algebra and geometry skills as part of the extended evaluation.

177. Mr. D. testified that he believed C.D. should be in school; and therefore, despite Natick's refusal to proceed unless the IEP he rejected was implemented as part of the extended evaluation, the Parents agreed to move forward following multiple unsuccessful attempts to negotiate a more appropriate settlement.

178. Mr. D. testified that his understanding of the purpose of the extended evaluation was for Natick to obtain information regarding C.D.'s vocational skills so that they could write an appropriate IEP.

179. Mr. Luff testified that the District proposed the extended evaluation because the Parents had questions about how the ACHIEVE program would provide C.D. with educational benefits and a FAPE in the LRE, and that they proposed the extended evaluation to help the Parents feel more comfortable about the program.

180. Ms. Molinari-Bates testified that the purpose of the extended evaluation was to facilitate

C.D.'s participation in the ACHIEVE program, because the Parents were hesitant to accept the IEP and placement.

**September 2017 - October 2017 Extended Evaluation**

181. C.D. arrived at the ACHIEVE program in September 2017 for the extended evaluation.

182. Mr. D. testified that C.D. was very unhappy at the ACHIEVE program and refused to go to school for the first time in her life.

183. Mr. D. testified that to encourage C.D.'s self-advocacy skills and independence he asked her to write down her concerns so that she could discuss them with Mr. Mark Miller ("Mr. Miller"), the Director of the ACHIEVE program.

184. While the Father was at work, C.D. wrote down her concerns, which in her own words were outlined as follows:

> Reasons why I feel unhappy about going:
>
> - I took 2 years of consumer skills and career ed. I know all of that.
> - The math is very easy. I'm on algebra, geometry, which I need to pass my MCAS.
> - Field trips, half days. I should be able to not go or stay home, so I can do my math homework.
> - I feel like in this class, I feel bad about myself because that's why I left to go to a different school.
> - I witnessed that the kids can do whatever they want, which is disruptive. Like leave or use their phones.

185. Mr. D. testified that the document was in C.D.'s handwriting, that he did not assist her with preparing it in any way and did not see the document until he returned home from work.

186. Mr. D. further testified that out of C.D.'s five (5) reasons, the one that was most upsetting to him was that C.D. felt badly about herself at ACHIEVE, because, "…everything,

you know, that we worked on to build up her self-esteem was…going -- was going down."

187. Mr. Miller was very receptive to C.D.'s concerns and agreed to make several changes to her program, which included allowing her to miss field trips so that she could use the time to work on her Math homework in preparation for the MCAS.

188. During Ms. Molinari-Bates' testimony, Natick's counsel objected to the questions from Parents' counsel regarding the ACHIEVE program, Gradpoint and MCAS.

189. The Hearing Officer asked whether the Director of ACHIEVE would be testifying.

190. Natick's counsel assured the Hearing Officer that the Director of ACHIEVE, Mr. Miller, would be testifying.

191. Parents' counsel agreed to reserve her questions regarding the MCAS, Gradpoint and the ACHIEVE program for Mr. Miller in reliance upon Natick counsel's promise.

192. At the close of the third day of the hearing, after the Parents had rested their case, Natick's counsel, without any explanation or request for a continuance, informed the hearing officer that Mr. Miller would actually not be testifying at all, effectively precluding not only the Parents, but also the Hearing Officer from obtaining testimony from the Director of the proposed program for C.D., her primary special education teacher, and the only witness who had expertise regarding MCAS and Gradpoint.

193. During that same time-frame, Ms. Brown, sent at email to C.D. with information about Cosmix.

194. Ms. Brown indicated that she: "would be happy to meet there for a tour," and stated:

> "[p]lease let me know what days and times may work and I'll call and arrange this. My thought is that you can do this program and continue at ACHIEVE, we would just need to be flexible with your schedule."

195. Ms. Brown further noted that the State recently changed the hourly requirements for a

license, "which will go into effect in the next few months…, however, those enrolled now or before this change will be 'grandfathered in.'"

196. Relying on Ms. Brown's promise, C.D. enrolled in Cosmix at Parents' expense.

197. As of the date of the hearing in this matter, C.D. had successfully completed the one-thousand (1,000) hours she needed to be eligible to take the Cosmetology licensing exam.

198. Completion of the program required C.D. to demonstrate her knowledge of the program by passing approximately thirty-two (32) written Chapter tests and successfully completing multiple practical hands-on demonstrations and activities.

199. In May 2017, C.D. completed all requirements for the program and graduated.

**October 31, 2017 Meeting**

200. On October 31, 2017, a meeting was held to review the results of the extended evaluation.

201. Ms. Erin Miller ("Ms. Miller"), Assistant Director of Student Services at Natick High School, confirmed that the extended evaluation was solely intended for the District to obtain information regarding C.D.'s current vocational skills, in particular her soft skills, so that Natick could propose an appropriate IEP.

202. C.D. expressed her dissatisfaction with the ACHIEVE program and the Gradpoint program, including that she was just guessing the answers to move through the program.

203. C.D. expressed her satisfaction with Cosmix and the 1:1 MCAS tutoring and wanted to continue with both.

204. Mr. Miller reiterated that Gradpoint is a supplemental tutorial program used at Natick High School "as a full class…or an after-school class."

205. Mr. Miller indicated that Gradpoint covers the spectrum of information on the MCAS but

the student moves sequentially through their program.

206. Mr. Miller noted that the program is a year-long program and that C.D. had completed 5% of it.

207. Natick did not explain how the use of a sequential year-long on-line program, in which C.D. had completed only the first 5% of the sequence, could prepare her for the Math MCAS exam, which at the time of meeting, was only a few weeks away, other than to note that C.D. was preparing for the Math MCAS at ACHIEVE using the Gradpoint program because, "Gradpoint is the instructional program offered through the Natick Public School District."

208. Ms. Anne Connors ("Ms. Connors"), C.D.'s Math tutor provided by Natick, attended the meeting at the Parents' request.

209. Ms. Connors noted that due to her language deficits, it was important for C.D. to prepare for the MCAS using the actual MCAS tests, rather than an online program like Gradpoint.

210. When Mr. D. opined that he did not think Gradpoint was working for C.D., Ms. Molinari-Bates provided no explanation of the District's decision other than to respond, "but seems to me, we feel like it's working."

211. Ms. Connors indicated that C.D. always showed up for tutoring and was willing to work hard, but that she was very tired after school and the one time she inadvertently scheduled the tutoring for the morning, C.D. performed much better.

212. Mr. D. again asked for an explanation regarding why the tutoring was a supplemental service that could not be provided during the school day.

213. Ms. Molinari-Bates explained that if C.D. was getting tutoring during the school day, she would be missing out on other aspects of the functional life-skills program that Natick decided she needs.

214. Mr. Miller indicated that the other aspects of the ACHIEVE program that Natick decided C.D. needs, included, using an on-line banking program, going on field trips to the grocery store and Planet Fitness, and participating in a daily cooking activity.

215. Mr. Miller reported that C.D. was well-equipped at navigating the grocery store and had cooked chicken parmesan and fettucine alfredo for the ACHIEVE school lunch, noting, "[s]he mentioned she has had experience with it, yes. She didn't say to what extent but -- We can see the extent. She's good."

216. Mr. D. informed Natick that C.D. was a member of Planet Fitness and accompanied him there several times per week.

217. During the last few minutes of the meeting, Natick indicated that they would be proposing a full-time five (5) day per week program at ACHIEVE and would not be flexible with C.D.'s schedule so that C.D. could attend Cosmix, as Ms. Brown had promised.

218. Mr. D. indicated that C.D. would be willing to attend Cosmix less than 4 days per week if the ACHIEVE program addressed her unique needs and individual circumstances.

219. Natick never explained during the meeting on October 31, 2017, during any other meeting, or during the hearing the District's rationale for believing C.D. needed a full-time five (5) day per week program in a self-contained functional life-skills program rather than any time in a vocational program in the community with access to nondisabled peers and clients, working towards her specific vision of becoming a licensed Cosmetologist, other than to note that "we think she needs a five (5) day program at ACHIEVE."

**IEP Following October 2017 Meeting**

220. The Parents received the proposed IEP on November 2, 2017, proposing a full-time, five

(5) day per week program in the ACHIEVE program.

221. The District made only minor changes to the Functional Academics and Career Preparation goals and no changes to the Communication goal, and without any explanation to the Parents, completely eliminated the Independent Living Skills and Community Participation goals.

222. The Parents rejected the proposed IEP goals in part, including use of the on-line Gradpoint program.

223. The Parents accepted the 1:1 tutoring, the speech and language services, job coaching services and the Special Education/Vocational training goal.

224. The Parents accepted the proposed placement on Fridays only.

225. The Parents included a nine (9) page attachment to their rejection outlining the reasons for their rejection, which included that "C.D. was attending Cosmix, where she is obtaining vocational training in her area of interest, as well as community-based instruction in functional math, as well as reading, writing and communication skills to prepare her for independence and adult living."

**February 6, 2018 Meeting**

226. In January 2018, Natick placed C.D. in an internship at Spavia in the Natick Mall for three (3) hours on Fridays.

227. Spavia is a day spa that provides massages, facials and skin treatments.

228. A meeting was held on February 6, 2018 for C.D.'s annual review.

229. Ms. Brown described C.D.'s responsibilities at Spavia, which included turning on the lights, turning up the heat, folding towels, and checking inventory.

230. C.D. informed the team that she did not want to return to Spavia because she felt that Ms. Brown and Ms. Butterfield's presence observing her work made her feel embarrassed and appear incapable of doing the work on her own.

231. Ms. Brown indicated that the owner of Spavia had informed her that C.D. had a lot of amazing skills; that she fit in since her first day; and that she wanted her to return.

232. Ms. Brown and Ms. Butterfield attempted to discuss C.D.'s concerns, but Ms. Molinari-Bates cut-off the conversation, stating, "anything else on this piece? No?" and moved on with her agenda.

233. Ms. Butterfield reported that C.D. does really well with problem-solving exercises and interpreting non-verbal communication.

234. Mr. Miller reported that although C.D.'s class time was limited on Fridays, C.D. works well, individually and in groups, but needs reminders to self-advocate.

235. C.D. informed the team that she does not feel like she is getting any benefits from the ACHIEVE program, that she is not challenged by the speech services which she has had before, and that she wants to focus on preparing for the Math MCAS so she could obtain a high school diploma.

236. Ms. Molinari-Bates responded, "we're still going to propose a full-time program as we have in the past," and moved on with her agenda.

237. Ms. Connors indicated that C.D. always comes to the tutoring sessions, sits down and is ready to go, but that she is very tired after school hours and that scheduling the tutoring on Saturdays has been very difficult due to her own scheduling conflicts.

238. Ms. Connors confirmed that the MCAS is heavily weighted towards algebra and recommended that C.D. needs approximately one (1) hour per day, five (5) hours per week, of in-depth subject preparation if her goal is to pass the MCAS.

239. Ms. Connors opined that C.D. was losing her motivation to take the MCAS following her last unsuccessful attempt to gain the additional four (4) points she needed in November 2017.

240. Mr. D. again asked whether Natick would assist C.D. in filing for the MCAS performance appeal.

241. Natick again responded that they would not consider doing that.

242. Mr. D. offered to arrange C.D.'s schedule at Cosmix so that she could attend tutoring in the mornings.

243. Mr. Luff offered to include an academic math goal in the IEP and the tutoring as part of the ACHIEVE program so that C.D. could attend tutoring during the school day.

244. The Parents had been asking Natick to include tutoring as part of the ACHIEVE program since May 2017 but were repeatedly told that was impossible because tutoring is a supplemental service.

245. Natick did not provide any explanation for their decision to incorporate the tutoring into the ACHIEVE program at that time, or why the tutoring could not have been incorporated into the ACHIEVE program sooner.

246. Following the meeting, C.D. decided to take a break from preparing for the MCAS exam.

**February 6, 2018 - February 6, 2019 IEP**

247. The Parents received the proposed IEP on March 2, 2018.

248. Natick finally included an academic math goal in the IEP with 1:1 tutoring during the

school day.

249. Natick continued to propose three (3) hours of tutoring despite the recommendation of five (5) hours by Natick's tutor.

250. Natick continued to propose placement in the ACHIEVE program full-time five (5) days per week, with no flexibility that would enable C.D. to continue attending the Cosmetology program at Cosmix if the Parents accepted the IEP.

251. The Parents rejected the IEP goals and placement in part, attaching a nine (9) page document outlining their reasons for rejection, which included Natick's continued inflexibility regarding C.D.'s schedule at ACHIEVE, refusing to consider proposing any option other than placement at the ACHIEVE program for any schedule less than full-time, five (5) days per week.

252. Among other comments made, the Parents noted that:

> It is a positive step forward that Mr. Luff has now offered to include math tutorial services for [C.D.] within the proposed IEP for 2018; however, such services could have been included years ago within the school day. Such an arrangement with, appropriate present levels of performance, goals, objectives and evaluation procedures could have been addressed years ago through the IEP process. Perhaps, if that have been done, [C.D.] might have passed her MCAS like she did with the ELA and the Science and Technology area by now.

**<u>February 2019 - March 2019 IEP</u>**

253. The Parties agreed to forgo an IEP team meeting for the purpose of proposing an IEP for the one-month period between the expiration of C.D.'s previous IEP and her 22nd birthday on March 15, 2019.

254. The District proposed an IEP that was identical to the IEP proposed on February 5, 2018.

255. The Parents rejected the IEP for the same reasons that they had rejected the IEP

previously proposed.

256. The IEPs proposed by Natick for the 2016-2017, 2017-2018, and 2018-2019 school years were not based upon age-appropriate transition assessments, and were not based on C.D.'s individual needs, in consideration of her strengths, preferences and interests; set low expectations and were not designed to enable C.D. to obtain meaningful educational benefits in accordance with her potential, thereby denying her a FAPE in the LRE.

257. Natick committed multiple additional procedural violations between 2016 and 2019, including, but not limited to, predetermining C.D.'s goals and placement based on impermissible factors, including, but not limited to, her category or significance of her disability; administrative convenience; availability of services; and configuration of the service delivery system.

258. Defendants Luff and Molinari-Bates, under color of state law, acted willfully, knowingly and purposefully and/or with deliberate indifference to C.D.'s rights under federal law and to the foreseeable consequences of their conduct by, including, but not limited to, failing to schedule an IEP meeting between June 2016 (when they realized their error), and September 29, 2016 (when the IEP meeting was held); and proposing an extended evaluation as a means to force the Parents to accept the proposed IEP and placement, evidencing bad faith, gross negligence and intentional discrimination, with deliberate indifference to C.D.'s constitutional rights and in retaliation for the Parents' previous due process actions to enforce those rights under Federal law.

259. As a direct and proximate result of the negligence and/or intentional acts and omissions of all Defendants, the Plaintiff, C.D. suffered clear emotional harm, including, but not limited to, feeling badly about herself, frustrated, and unhappy, as expressed by both C.D. and Mr. D., and as evidenced by C.D.'s refusal to attend school for the first time in her life, and eventually her

decision to quit preparing for the Math MCAS, after devoting years of dedication and effort to enable her to pass the ELA and Science/Technology MCAS exams, and come within four (4) points of passing the MCAS exam in Math.

260. Natick discriminated against C.D. and violated her rights under Federal law by refusing to provide her with appropriate services and goals based upon the District's policy that academic goals and MCAS preparation cannot be incorporated within an IEP for students eligible to receive post-high school special education services, limiting such services to functional academics and vocational life-skills.

261. In denying the Parents' motion to add claims for discrimination and retaliation in violation of C.D.'s rights under Section 504 and Section 1983, the Hearing Officer disregarded the testimony of Ms. Molinari-Bates and Mr. Luff, which evidenced their gross misjudgment and bad faith with deliberate indifference to C.D.'s constitutional rights and to the foreseeable consequences of their conduct in retaliation for the Parents' previous due process actions to enforce C.D.'s rights under Federal law, and in so ruling, demonstrated bias and abuse of discretion.

262. In reaching her conclusion that Natick did not interfere with the Parents' right to educational planning for C.D. during the Team meetings held on September 29, 2016, February 14, 2017, May 10, 2017, October 31, 2017, and February 6, 2018, the Hearing Officer disregarded substantial evidence on the record, including that Natick predetermined C.D.'s goals and placement in the ACHIEVE program, were not open to discussing any other options, and failed to provide cogent explanations for their decisions.

263. In ruling that the IEP's proposed by Natick for the 2016-2017, 2017-2018, and 2018-2019 school years were reasonably calculated to provide C.D. with a FAPE in the LRE, the

Hearing Officer failed to apply the FAPE, LRE and legal requirements of the IDEA appropriately and failed to consider the entire record, resulting in legal error and evidencing bias and abuse of discretion.

264. In reaching her Decision regarding the proposed IEPs and the existence of additional procedural violations, the Hearing Officer credited the testimony of Natick's witnesses, who had never worked with C.D. directly or indirectly, had never observed C.D. in her educational or vocational placements, and had not reviewed all of C.D.'s IEP's or progress reports, and whose testimony conflicted with the evidence on the record, over the testimony of the Parents' witnesses who had worked with C.D. directly for many years, observed her at her educational and vocational placements and reviewed all of her IEP's and progress reports, and in so ruling, demonstrated bias and abuse of discretion.

## CAUSES OF ACTION

## COUNT I

## Free Appropriate Public Education/Least Restrictive Enviroment (IDEA)

265. Plaintiffs incorporate by reference the allegations contained in paragraphs 1-264 above and allege that the IEP's proposed by Natick for the 2016-2017, 2017-2018, and 2018-2019 school years, were not based upon age-appropriate transition assessments, were not based on C.D.'s individual needs, taking into account her strengths, preferences and interests; set low expectations and were not designed to enable C.D. to obtain meaningful educational benefits in accordance with her potential, thereby denying C.D. a FAPE in the LRE in violation of the Individuals with Disabilities Education Act .

**COUNT II**

**Procedural Violations (IDEA)**

266. Plaintiffs incorporate by reference the allegations contained in paragraphs 1-264 and allege that Natick committed multiple procedural violations between 2016 and 2019, including, but are not limited to, interfering with the Parents' right to meaningfully participate in educational planning for C.D. by predetermining her goals and placement and failing to provide the Parents with cogent explanations for their decisions, and by designing C.D.'s goals, placement and services based upon impermissible factors in violation of the Individuals with Disabilities Act, including but not limited to, C.D.'s category or significance of disability; administrative convenience; availability of services; and configuration of the service delivery system, impacting C.D.'s access to educational opportunity and benefit, and causing her substantive harm.

**COUNT III**

**Discrimination (Section 504)**

267. Plaintiffs incorporate by reference the allegations contained in paragraphs 1-264 and allege that Natick, Defendant Luff and Defendant Molinari-Bates failed to determine C.D.'s service needs based on reasons other than, including but not limited to, her category or significance of her disability; administrative convenience; availability of services; and configuration of service delivery system; evidencing bad faith and intentional discrimination in violation of Section 504 of the Rehabilitation Act of 1973.

**COUNT IV**

**Retaliation (Section 504 and Section 1983)**

268. Plaintiffs incorporate by reference the allegations contained in paragraphs 1-264 and

allege that the conduct of Natick, Defendant Luff and Defendant Molinari-Bate evidenced gross misjudgment and bad faith with deliberate indifference to C.D.'s constitutional rights and to the foreseeable consequences of their conduct in retaliation for the Parents' previous due process actions to enforce C.D.'s rights under Federal law, in violation of Section 504 of the Rehabilitation Act of 1973, and 42 U.S.C. §1983.

**COUNT V**

**Discriminatory Policy (Section 504 and Section 1983)**

269. Plaintiffs incorporate by reference the allegations contained in paragraphs 1-264 and allege that Natick, Defendant Luff and Defendant Molinari-Bates discriminated against C.D. by determining her goals and services based on the District's policy to restrict post-high school transition services to non-academic instruction, focusing solely on functional academics and life-skills, regardless of a student's vision, current circumstances and individual potential, demonstrating gross misjudgment and bad faith with deliberate indifference to C.D.'s constitutional rights and to the foreseeable consequences of their conduct, in violation of Section 504 of the Rehabilitation Act of 1973, and 42 U.S.C. §1983.

**COUNT VI**

**Promissory Estoppel**

Plaintiffs incorporate by reference the allegations contained in paragraphs 1-264 and allege that Natick, through their Transition Coordinator, Ms. Brown, made a clear and unambiguous promise to the Parents, that Natick would be flexible with C.D.'s schedule at ACHIEVE if she enrolled in Cosmix. It was reasonable and foreseeable that the Parents would rely on that promise and enroll C.D. in the program given that Ms. Brown indicated she would be willing to meet them there for a tour and indicated that the law regarding the

hourly requirements may be changing in the near future, and Cosmix was a perfect match for C.D.'s longstanding vision of becoming a Cosmetologist. By reason of their reasonable reliance on Ms. Brown's promise and Natick's subsequent refusal in bad faith to offer any less than a full-time five (5) day per week program at ACHIEVE following C.D.'s enrollment in Cosmix, C.D. suffered educational detriment. By offering a program following C.D.'s enrollment in Cosmix, which, if accepted would have precluded C.D. from reaching her vision while still eligible to receive special education services, the District forced C.D. and the Parents to proceed without the support and in opposition to the District, causing C.D. to suffer a deprivation of educational benefit.

## **PRAYERS FOR RELIEF**

WHEREFORE, the Plaintiffs pray that this Honorable Court:

270. Assume jurisdiction over this matter.

271. AFFIRM the Hearing Officer's final Decision dated August 29, 2019, with respect to whether Natick interfered with the Parents' right to participate meaningfully in educational planning for C.D., amounting to substantive harm, and entitling them to compensatory relief.

272. AFFIRM the Hearing Officer's final Order dated August 29, 2019, with respect to compensatory relief, requiring Natick to reimburse the Parents for the tuition they paid for C.D.'s enrollment during the 2015-2016 school year.

273. REVERSE the Hearing Officer's final Decision dated August 29, 2019, with respect to whether the IEPs proposed by Natick for the 2016-2017, 2017-2018, and 2018-2019 school years failed to provide C.D. with a FAPE in the LRE.

274. REVERSE the Hearing Officer's final Decision dated August 29, 2019, with respect to whether there were any additional procedural violations committed by Natick between 2015 and 2019

275. DECLARE that the Parents met their burden of showing that the IEPs proposed by Natick for the 2016-2017, 2017-2018, and 2018-2019 school years were not reasonably calculated to provide C.D. with a FAPE in the LRE, in violation of the Individuals with Disabilities Education Act.

276. DECLARE that the Parents met their burden of showing that Natick committed procedural violations, in addition to failing to propose an IEP for the 2015 – 2016 school year, in violation of the Individuals with Disabilities Education Act, resulting in substantive harm to C.D., and entitling them to compensatory relief.

277. DECLARE that the Parents met their burden of showing that their unilateral placement at Learning Prep provided C.D. with a FAPE in the LRE.

278. DECLARE that Natick, Mr. Luff, and Ms. Molinari-Bates discriminated and retaliated against C.D. in violation of Section 504 of the Rehabilitation Act of 1973, and 42 U.S.C. §1983.

279. DECLARE that the Parents reasonably relied upon the promise of Natick's Transition Coordinator that Natick would be flexible with C.D.'s schedule at ACHIEVE if she enrolled in Cosmix, causing her educational detriment.

280. DECLARE that the BSEA, through its Hearing Officer, violated C.D.'s rights under State and Federal special education law by issuing a final Decision based upon mistakes of fact and errors of law, made upon unlawful procedures, not supported by a preponderance of the evidence, unwarranted by the facts on the record, biased, arbitrary and capricious, an

abuse of discretion and otherwise not in accordance with law.

281. FIND that the Parents are the prevailing parties in this matter.

282. AWARD the Parents reimbursement for the tuition, related fees and transportation costs associated with their unilateral placement of C.D. at Learning Prep for the 2016-2017, and 2017-2018 school years, including her attendance during the summers for ESY services.

283. AWARD the Parents reimbursement for the tuition, related fees and transportation costs associated with their enrollment of C.D. in the Cosmetology Program at Cosmix.

284. AWARD the Parents reimbursement for the costs of privately obtained educational tutoring services during the school years and summers, including tutoring services privately obtained following C.D.'s 22nd birthday in March 2019, through the current date and continuing until C.D. either passes the Math MCAS, completes a successful performance appeal, or definitively decides to cease participation in the testing.

285. AWARD the Parents compensatory educational services focused on the Math MCAS, either in the form of supplemental tutoring and coordination with the Massachusetts Department of Education to either ensure that C.D. is permitted to sit for the exam in Natick, or by working with the Superintendent of Natick Public Schools, and any other agencies/educational institutions necessary to obtain documentation for C.D. to submit a performance appeal.

286. AWARD the Parents their reasonable attorney's fees and costs pursuant to the Individuals with Disabilities Education Act.

287. AWARD the Parents damages, including, but not limited to, expert witness fees and other fees, costs, and expenses pursuant to Section 504 of the Rehabilitation Act of 1973 and 42 U.S.C. §1983.

288. AWARD such other relief as the Court deems just and proper

Dated: November 27, 2019

Respectfully submitted, C.D., M.D., and P.D.,
By their attorney,

/s/ Laurie R. Martucci

Laurie R. Martucci, Esq.
Martucci Law Associates
20 Cabot Blvd., Suite 300
Mansfield, MA 02048
BBO# 561946
Telephone: 508-964-6664
Telefax: 508-964-6665
Email: lrm@martucci-law-associates.com