# COMMONWEALTH OF MASSACHUSETTS

# DIVISION OF ADMINISTRATIVE LAW APPEALS

# BUREAU OF SPECIAL EDUCATION APPEALS

_____

In Re:  Estella[1]

&                                                                                    BSEA #1712065

Natick Public Schools
_____

## DECISION

This Decision is issued pursuant to 20 U.S.C. 1401 *et seq*., 29 U.S.C.§794, M.G.L. c71B and 30A and the regulations promulgated under those statutes.  A Hearing was held in this matter on June 26, 2018 and May 15, 16 and 17, 2019 at the Administrative Offices of the Natick Public Schools in Natick, MA.  The Parents were represented by Attorney Laurie Martucci.  The School was represented by Attorney Alisia St. Florian.

The Official Record of the Hearing consists of exhibits submitted by the Parents marked: P-15 - P-81, P-83 - P91, P-94 - P-103; exhibits submitted by the School marked: S-2 – S-40; and approximately 16 hours of recorded oral testimony and argument.  The Parties submitted written closing arguments on July 24, 2019 and the record closed on that date.[2]

PROCEDURAL HISTORY

The instant hearing is the culmination of a long line of Hearing Requests lodged by the Parents at the BSEA in the last 8 years which have resulted in at least five Decisions, three of which are pertinent here[3].  Hearing Officer Crane heard the Parents' challenge to the 2008-2009 5th grade IEP developed by Natick calling for Estella's continued placement in a substantially separate in-district elementary age program.  He found Natick's proposed IEP and placement to

---

[1] "Estella" is a pseudonym chosen by the Hearing Officer to protect the privacy of the Student in documents available to the public.  Derivative pseudoinitials are used for family members.

[2] To the extent the Parents' uncommonly voluminous closing argument raises new issues not set out in this Decision, or references "facts" not in evidence, it is disregarded.

[3] The relevant BSEA Decisions are discussed in the body of the Decision.  The non pertinent ones include a Decision issued by Hearing Officer Figueroa that was limited to a procedurally based claim for compensatory services. (BSEA 1404110) 20 MSER 81 (2014); and other BSEA actions not relevant to the Parties' claims here, e.g. 20 MSER 296 (2013) (BSEA 1402591).

provide a free, appropriate public education to Estella. *Student v. Natick Public Schools*, 17 MSER 55 (2011).

The Parents then enrolled Estella in Crista McAuliffe Charter School for the 6th, 7th and 8th grades. The Parents rejected the IEP developed by the McAuliffe Charter School for the 2010-2011 school year (7th grade). Hearing Officer Crane found McAuliffe's proposed IEP to be appropriate for Estella. *In Re: Christa McAuliffe Regional Charter Public* School, 19 MSER 137 (2013). Estella remained at McAuliffe through the 2011-2012 school year (8th grade). She graduated from McAuliffe in June 2012.

The Parents then placed Estella at the Learning Prep School, a private special education program, for grades 9, 10 & 11, the 2012-2013, 2013-2014, and 2014-2015 school years. After rejecting Natick's proposed IEPs for those school years the Parents requested a due process hearing. BSEA Hearing Officer Putney-Yaceshyn found that the IEPs Natick developed for all three years were reasonably calculated to provide Estella with a free, appropriate public education. *Student v. Natick Public Schools*, 14-08860, July 24, 2015.

The Parents appealed the Decision in BSEA #1408860 to the U.S. District Court for Massachusetts. C.A. No 1513617-FDS. The District Court remanded the action to the BSEA for further consideration of the federal and state LRE[4] standards in light of an intervening U.S. Supreme Court opinion, *Endrew F. v. Douglas County School District*, 580 U.S. 137 S.Ct. 988, (2017). After receiving the BSEA's clarification of the LRE analysis used in BSEA #1408860 the District Court affirmed the BSEA's Decision for Natick finding that the Hearing Officer had applied a FAPE analysis consistent with *Endrew F.. C.D. v. Natick Public Schools*, (C.D. II) No. 15-13617-FDS, 2018 WL 3510291 (D. Mass. July 20, 2018), *C.D. v. Natick Public Schools*, (C.D.I) No 15-13617-FDS, 2017 WL 3122654 (D.Mass. July 21, 2017).

The Parents appealed the District Court's Decision to the U.S. Court of Appeals for the First Circuit. After a positive discussion of the FAPE and LRE analysis undertaken by the District Court and the BSEA, the 1st Circuit affirmed the Decisions finding that Natick had developed appropriate IEPs for Estella. *C.D.V. Natick Public School District, No. 18-1794 (1st Cir. May 22, 2019)*.

This BSEA Hearing involved seven IEPs over the course of four school years: 2015--2016 (12th Gr.), 2016-2017 (post H.S.); 2017-2018 (post H.S.); 2018-2019 (post H.S.). The Parents originally filed a Hearing Request on June 27, 2017 seeking a declaration that Natick had failed to propose IEPs for the 2015-2018 school years that could provide a FAPE to Estella and seeking reimbursement of expenses associated with their unilateral placement at Learning Prep School. The BSEA scheduled the Hearing for July 18, 2017 before Hearing Officer Berman. Several postponements were granted to permit the Parties to engage in negotiations, conduct discovery, and await the U.S. District Court's treatment of the immediately preceding BSEA action then on appeal. The Parties agreed to Hearing dates of June 26 and 27, 2018. On June 22, 2018 the matter was re-assigned to Hearing Officer Byrne. The Hearing began on June 26, 2018 but was suspended after the testimony of the first witness due to participant illness. The Hearing was re-scheduled to September 20 and 25 and October 4, 2018. Those dates were postponed at

---

[4] "LRE" is shorthand for Least Restrictive Environment.

the Parties' request in order to permit them to engage in mediation at the Federal Court. When that was unsuccessful the Hearing was re-entered on the BSEA calendar for May 16, 17 and 18, 2019.

ISSUES[5]

1.    a)    Whether Natick's failure to propose an IEP for Estella for the 2015-2016 school year impeded the Parents' ability to participate meaningfully in educational planning for Estella? and
    b)    Whether Natick's failure to propose an IEP for Estella for the 2015-2016 school year caused substantive educational harm for which Estella is entitled to compensatory services?

2.    a)    Whether Natick impeded the Parents' ability to participate meaningfully in the Team meeting held on September 26, 2016?
    b)    Whether the September 2016-September 2017 IEP Natick developed as a result of that meeting was reasonably calculated to provide a free appropriate public education to Estella in the least restrictive environment?
    c)    If not, whether Estella is entitled to compensatory relief?

3.    a)    Whether Natick impeded the Parents' ability to participate meaningfully in the Team meeting held on February 14, 2017.
    b)    Whether the February 2017-February 2018 IEP Natick developed as a result of that meeting was reasonably calculated to provide Estella with a free appropriate public education?
    c)    If not, is Estella entitled to compensatory relief?

4.    a.)    Whether Natick prevented the Parents from participating meaningfully in the Team meeting held on May 10, 2017?
    b)    Whether the 2017-2018 IEP developed by Natick as a result of that meeting was reasonably calculated to provide Estella with a free appropriate public education?
    c)    If not, is Estella entitled to compensatory relief?

5.    a)    Whether Natick impeded the Parents' ability to participate meaningfully in the Team meeting held on October 31, 2017?
    b)    Whether the 2017-2018 IEP Natick developed as a result of that meeting was reasonably calculated to provide Estella with a free appropriate public education?
    c)    If not, is Estella entitled to compensatory relief?

6.    a)    Whether Natick impeded the Parents' ability to participate meaningfully in the Team meeting held on February 6, 2018?
    b)    Whether the 2018-2019 IEP Natick developed as a result of that meeting was reasonably calculated to provide Estella with a free appropriate public education?
    c)    If not, is Estella entitled to compensatory relief?

---

[5] The original issues set out on the first day of Hearing, June 26, 2018, were expanded and clarified by way of the Parents' Amended Request for Hearing submitted on March 5, 2019, which was allowed by the Hearing Officer with Natick's assent.

7.      Whether the final IEP proposed by Natick, covering the period February 2019 through the date of Estella's 22nd birthday in March 2019, was reasonably calculated to provide Estella with a free appropriate public education?

<u>LEGAL FRAMEWORK</u>

A student with special learning needs as defined by 20 U.S.C. 1401 et seq. and M.G.L.c 71B is entitled to receive a free, appropriate public education.  A free, appropriate public education, "FAPE" in educator and education law shorthand, is a set of specialized instructional methods, materials and services, curricular modifications, related therapeutic, supportive and health services, equipment, environmental adaptations and settings that are specifically tailored to an individual student's unique learning needs and designed to provide a meaningful educational benefit to the student.  34 CFR 300.300(3)(iii); *Endrew F. v. Douglas County School District*, 580 U.S. ___, 137 S. Ct. 988(2017); 603 CMR 28.02(17).  See also discussion at *Johnson v. Boston Public Schools*, 906 F.3d 182(1st Cir. 2018).[6]  What constitutes a meaningful educational benefit must be determined in the context of the student's "individual circumstances" and potential to learn.  *Endrew F., supra.*  A student's goals should be appropriately ambitious… just as advancement from grade to grade is appropriately ambitious for most students in a typical classroom, *Endrew F., supra*, and be reasonably likely to measurably advance the student toward the goal of increased learning and independence. *D.B. v. Esposito*, 675 F.3d 26 (1st Cir. 2012).

The primary vehicle for delivery of a FAPE is an Individualized Education Program ("IEP").  The IEP must be developed by a Team that includes the parent(s) or guardian(s), must be custom tailored to the student's unique needs and learning potential, and must be designed to produce a "meaningful educational benefit" and "demonstrable improvement" in the educational, behavioral and personal skills identified as special needs.  *Lenn v. Portland School Committee*, 998 F.2d 1083 (1st Cir. 1993).

IDEA-eligible students are entitled to be educated in the "least restrictive environment" (LRE), that which offers the greatest amount of integration in and/or exposure to the mainstream of typical school life that is feasible while maintaining appropriate special education services. Students should be placed in segregated settings, such as private day schools, only when the nature or severity of the disability is such that the student cannot benefit from a general education setting with supports and services, or the student has demonstrated an inability to make appropriate educational progress with carefully designed and provided special education services in a mainstream setting.  *Roland M. v. Concord School Committee, 910 F.2d 983 (1st Cir. 1990.*

---

[6] In *Johnson*, *supra*, the U.S. Court of Appeals confirmed that the FAPE standard used by the 1st Circuit in its previous reviews of disputed special education programs and placements, and followed by the U.S. District Court for Massachusetts and the Bureau of Special Education Appeals, was consistent with the standard cited by the U.S. Supreme Court in *Endrew F.*, *supra*.  See e.g. *D.B. v. Esposito*, 675 F.3d 26 (1st Cir. 2012); *Sebastian M. v. King Philip R.S.D.*, 685 F.3d 79 (1st Cir. 2012); *Lessard v. Wilton-Lyndeborough Cooperative School District*, 518 F.3d 18 (1st Cir. 2008); *Murphy v. Timerlane R.S.D.*,22 F.3d 1186 (1st Cir. 1994); *Roland M. v. Concord School Committee*, 910 F.2d 983 (1st Cir. 1990); *Town of Burlington v. Department of Education*, 736 F.2d 773 (1st Cir. 1984).  The Court of Appeals recently re-confirmed, and more fully explained, its formulation of the FAPE standard and that standard's alignment with *Endrew F.*, in the immediate predecessor to this proceeding:  *C.D. v. Natick, No. 18-1794 (1st Cir. May 22, 2019).* Verg. Aen.1.203.

In a due process proceeding to determine whether a school district has offered or provided a free appropriate public education to an IDEA-eligible student, or whether the school district has deprived a student of FAPE because of substantive or procedural missteps, the burden of proof is on the moving party. *Schaffer v. Weast*, 546 U.S. 49 (2005). In this matter the Parents shoulder the burden of proof on all issues.

Should the Parents prove at hearing that the public school has failed in its duty to develop and/or implement an appropriate IEP for an eligible student, the parents may request that the Hearing Officer order an individually tailored remedy for the lapse. Here, the Parents are seeking two remedies: compensatory special education services and reimbursement of expenses associated with their "self-help" unilateral private day school and private vocational training program placements. An award of compensatory services is an equitable remedy. *Diaz-Fonseca v. Comm. of Puerto Rico*, 451 F.3rd 13 (1st Cir. 2006). Compensatory services may be available to make a student whole if a school district commits procedural violations that result in a denial of FAPE to an eligible student. *Pihl v. Mass. Dept. of Education*, 9 F.3d 184 (1st Cir. 1993). On the other hand, compensatory relief will not generally be awarded for merely technical, *de minimis* violations that do not result in a denial of FAPE or preclude parents from meaningful participation in the Team process. *Murphy v. Timerlane Regional School Dist.*, 22 F,3d 1186 (1st Cir. 1994). The conduct of the parents may be a relevant factor in determining whether an award of compensatory services is warranted. *C.G. v. Five Town Community School Dist.*, 513 F.3d 279 (1st Cir. 2008), citing *Roland M., supra*.

STUDENT PROFILE

Estella's learning and personal characteristics have remained stable over time and are not in dispute. She is a friendly, cheerful, hardworking young woman with a positive approach to life. She is motivated to learn and accomplish her goals. She has solid social and conversation skills.

Estella qualified for services under the IDEA and M.G.L. c 71B as a result of an intellectual disability and communication impairment. Standardized cognitive function testing consistently placed Estella in the borderline range.[7] Speech-language testing revealed significant weaknesses in receptive and expressive language, with particularly low verbal comprehension scores and poor working memory. The scores reflect a language disability consistent with and additional to Estella's intellectual disability. Academic achievement testing shows that Estella operates below the average range in age-based comparisons, consistent with her disability. Her performance was weakest in verbal comprehension, memory, abstract reasoning and mathematics. Broadly, Estella has consistently demonstrated academic skills at the 2nd to 5th grade levels since 2015. She tests in the 4th grade range on skills requiring abstract reasoning, verbal comprehension and generalization such as reading comprehension and demonstrates skills in the high 5th to 6th grade range on tests of rote and concrete learning such as reading decoding, spelling and oral fluency. Mathmatics scores cluster in the 1st-2nd grade level.
(P-63; P-65; P-67; P-69; P-71; P-73)

---

[7] Her intellectual function scores, in aggregate, are in the low 70s.

Adaptive Living Skills as reported by her Parents and formally assessed during a Transition Evaluation in 2014 are moderately low. Estella has been determined to be eligible for adult services through the Massachusetts Department of Developmental Services. Her father is her court appointed guardian. (Mr. E.)

Prior to the events covered in this Decision Estella last attended the Natick Public Schools during the 2008-2009 school year when she was placed in the substantially separate ACCESS program class for the 5th grade. Estella attended the Crista McAuliffe Charter School for her 6th, 7th and 8th grade years. In the fall 2012, the Parents rejected Natick's proposed placement in the High School version of the ACCESS program and privately enrolled Estella in the Learning Prep School. Estella attended Learning Prep for the 9th, 10th, 11th and 12th grades: 2012-2016.[8] After completing high school course requirements Estella remained at Learning Prep during 2016-2017 for a post-graduate year. She has consistently reported interest in fashion, cosmetology and work in the beauty industry. Since leaving Learning Prep in June 2017 Estella has been engaged in a variety of learning activities with the support of Natick Public Schools and independently. She turned 22 in March 2019 and is no longer eligible for special education services.

1.    2015-2016 SCHOOL YEAR:

a)    The 2014-2015 IEP developed for Estella by Natick expired on June 13, 2015. The BSEA issued a Decision on July 24, 2015 finding, among other things, that the 2014-2015 IEP and the substantially separate ACCESS placement Natick had proposed were appropriate. The Decision did not address the 2015-2016 school year. The Natick Public Schools did not develop an IEP for Estella for the 2015-2016 school year. The Team did not meet during the 2015-2016 school year. The Parents did not notify Natick of their election to continue Estella's unilateral placement at the Learning Prep School during the 2015-2016 school year[9]. The Parents filed an appeal of the BSEA Decision on October 21, 2015. Estella completed 12th grade and Learning Prep's High School program at the conclusion of the 2015-2016 school year. (Luff; Mr. E.; Molinari-Bates; Thorell; S-35)

b)    Learning Prep is an approved special education day school which offers specialized instructional services solely to students with documented specific learning disabilities, language learning disorders, cognitive impairments, anxiety, autism and related disabilities. Learning Prep follows the Massachusetts Curriculum Frameworks and offers small academic classes, life skills instruction, speech-language therapy, vocational preparation and community internships. All students take the MCAS and 85% pass all three components. Learning Prep does not award High School diplomas to parentally placed students. Those students must meet their local school district's high school graduation requirements to earn a diploma issued by the district.

---

[8] For a more detailed educational/procedural history please refer to prior BSEA Decisions at *Student v. Natick*, 17 MSER 55 (2011); *Student v. McAuliffe Charter School*, 19 MSER 138 (2013) and *Student v. Natick*, BSEA #1408860, July 24, 2015.

[9] The Parents had previously provided annual private school placement notifications to Natick as required by 20 U.S.C. §1412 (a)(10)(c); 34 CFR §300.148.

Estella followed the standard 12th grade Learning Prep curriculum during the 2015-2016 school year. She took academic classes in English, History, Science, Math, Career Education, Consumer Skills and Health. The math class was an integrated geometry/algebra class targeted to MCAS preparation. Academic classes were held for 5 full days every other week. On the alternate week 12th grade students participated in "work-study", a supported vocational experience with internship placements in the community aligned with the student's area of interest. Estella participated in community internships in health care, retail and beauty enterprises. She passed all 12th grade course components and successfully completed the Learning Prep program. She passed the English and Science components of the MCAS. (Thorell; P-45, P-47, P-48, P-49)

Estella attended a four week summer program at Learning Prep after completing High School in 2016. (P-46).[10]

2.     2016-2017 SCHOOL YEAR

a)     In June 2016, the end of the 2015-2016 school year, Natick Town administrators forwarded a list of students attending private schools at parental expense to the Natick School Department. Estella's name was handwritten on the bottom of the list. Upon receipt Timothy Luff, the Assistant Superintendent for Student Services, directed Barbara Molinari-Bates, an Educational Team Leader, to set up Estella's Team meeting "asap". (Luff; P-15: Molinari-Bates) It was Natick's practice at that time not to hold Team meetings during the summer as necessary staff were unavailable. On August 15, 2016 Natick scheduled the Team meeting to develop Estella's 2016-2017 IEP to occur on September 15, 2016. (Molinari-Bates; P-26; P-27; P-29) The Team meeting actually took place on September 29, 2016. Mr. E. and the family's attorney, Ms. Martucci, participated. The Team reviewed a transcript and progress reports from Learning Prep which showed Estella to be making slow, steady progress toward achievement of her academic and transitional goals with specialized instruction in a substantially separate setting. (P-42; P-46; P-47; P-48; P-49; P-57) The Team also reviewed previous academic, psychoeducational and language testing which included a November 2014 formal transition evaluation conducted by Katie Brown, Natick's transition coordinator. Ms. Brown recommended that special education services focus on developing Estella's independent and adaptive living skills, her functional competencies in math (money, measurement, time management) and the communication and social language pragmatic skills necessary to support job placement and community participation. (P-72, S-39; see also P-62). The report of a psychoeducational evaluation conducted by Steve Imber in November 2014, dated May 4, 2015, contained no specific educational recommendations other than continued placement at Learning Prep. (P-63) Speech-Language testing conducted by Suzanne Flax in May 2015 resulted in confirmation of Estella's long term diagnosis of significant expressive and receptive language disorder. Ms. Flax recommended that Estella receive speech-language therapy (frequency, duration and setting unspecified) and be placed in a small class using visual cues, thinking maps, repetition and a predictable schedule "in the LRE". (P-63; P-65; P-71) The Parents presented their written and oral observations. The Team discussed Estella's goals of passing the MCAS, obtaining a high school diploma and working independently in the community. The Team discussed the MCAS appeals process as well as academic preparation for retaking the math

[10] The 2014-2015 IEP approved by the BSEA provided Estella with extended year special education services. (S-36)

component of the MCAS including the availability of on-line MCAS math preparation programs with ACHIEVE staff assistance.. The Team also discussed Natick's ACHIEVE program, a post-high school adult life and vocational preparation program, as well as other substitute or supplemental Natick and/or Parent supported programs that could be appropriate for Estella such as the Inclusive Concurrent Enrollment at Framingham State and a GED/Job Corps placement through the Shriver Center. (P-23; Miller; Brown; Molinari-Bates) Mr. E. and Ms. Martucci fully participated in the Team meeting, asking and answering questions, making observations, requests and suggestions and clarifying and commenting on Natick's proposals. (P-38)

b)      On September 30, 2016 Natick proposed an IEP for Estella offering her a placement in the ACHIEVE program with services targeted at improving her functional academic and communication skills, independent living, career preparation and community participation. The proposed 2016-2017 IEP did not offer services targeted to preparation to re-take the math component of the MCAS. Natick also requested Parent/Guardian consent to advance the 3 year re-evaluation. (S-31; S-32, S-33) The previous school-based re-evaluation had been completed in the fall 2014 while Estella was attending high school at Learning Prep. (P-23) The Parents accepted the proposed re-evaluation. The Parents rejected the proposed IEP. (P-32, S-32)

c)      ACHIEVE is a substantially separate, post high school, transition program for students aged 18-22. It focuses on development of independent skills in daily living, community participation, and functional academics. There are typically 9-11 students with a variety of disabilities enrolled in the program at any one time. Some have earned a high school diploma, some are eligible to receive a high school diploma but have elected not to, and some will not earn a high school diploma. Some students work toward completion of MCAS requirements. Targeted MCAS retake preparation takes place outside school hours with a specialized tutor. Some students work toward completion of high school academic course requirements. Some students participate in college credit programs. Some students have community job placements a few days each week. Some students elect a commercial learning experience (e.g. cooking school, driving instruction etc.) with associated instructional support in and permitted time away from
ACHIEVE. Each student's program is designed to meet her individual interests and goals.

        ACHIEVE is staffed by 2 special education teachers and 2 paraprofessionals. Natick's transition coordinator, Katie Brown, and a speech-language pathologist, Sara Butterfield, also provide ongoing services to ACHIEVE students. The program is located in a converted school building. It has its own full service kitchen, recreation room and gym as well as classrooms. Natick provides transportation to all ACHIEVE placements and activities. The program operates on a school day schedule:   9-11 work placements; 11-12 lunch;12-1 Planet Fitness; and
1-3 academic/communication skills.  (Miller; Brown; Molinari-Bates; P-83; P-84; P-85)

d)      Estella remained at Learning Prep throughout the 2016-2017 school year. She participated in a 5th/post-graduate year which repeated the academic classes, including the integrated geometry/algebra MCAS preparation course, in which she had participated during the 2015-2016 school year. Estella had different community internships during the 2016-2017 year than she had had the previous school year. (Thorell; P-50; P-52; P-53; P-54)

3.    FEBRUARY 2017 – FEBRUARY 2018

The Team reconvened on February 14, 2017 to consider the results of the 3 year re-evaluation conducted by Natick as well as a parentally secured psychoeducational evaluation conducted by Steve Imber (P-63; P-64) and a parentally secured speech-language evaluation conducted by Suzanne Flax. Both Parents attended the Team meeting along with their attorney, Ms. Martucci, and Dr. Imber and Ms. Flax.[11] The discussion included reviewing options for satisfying the math component of the MCAS, options for academic instruction in settings other than the ACHIEVE program, options for connections with adult disability service agencies for vocational preparation and internships and options for transitioning Estella to the ACHIEVE program before the conclusion of the 2016-2017 school year. Mr. E., his attorney and the 2 Parent consultants participated fully in the Team discussion, asking questions, presenting information, making suggestions and responding to Natick personnel's queries and comments. (P-39; P-22; Imber; Flax; Mr. E.)

The results of formal testing completed by Natick personnel and by the private evaluators were consistent with each other, with previous testing and with then current observations of Estella's school and community functioning. Standardized testing confirmed earlier diagnoses of cognitive impairment and communication disability. (S-25; P-68; S-26; P-69; S-27; P-67; S-28; S-29; P-64; P-66; See also § 1 *infra*), [12] Then 19 year old Estella functioned broadly in the 2nd-6th grade, 9-11 year old range in academic skills. Areas involving abstract reasoning, memory, reading and language comprehension problem solving and mathematical concepts were weakest. Standardized reading comprehension and math scores fell below the 3rd percentile. (P-67) Estella demonstrated relatively strong, though objectively low, adaptive and social skills. (P-68) Evaluators uniformly recommended that Estella participate in a structured vocational program. They also made consistent and congruent recommendations for specific instructional interventions to support Estella's learning in the classroom and in the community; multimodal presentation of new material; repetition; hands on instruction with modified materials; explicit directions; preview/review; direct instruction in social language and problem solving skills; use of calculator and opportunities to work in the vocational field of greatest interest. (P-64; P-68; P-66; P-69; P-67) While finding that Estella's math skills remained stuck at the 2nd to 4th grade level despite 3 years of MCAS prep math instruction at Learning Prep, Dr. Imber alone supported the Parents' often expressed desire that Estella receive math instruction targeted to pass the math component of the MCAS so that she would be eligible for a Natick High School diploma. (P-64; Imber)

After the Team meeting Natick developed an IEP calling for Estella to follow a functional academic, vocational preparation, transition curriculum in the ACHIEVE program. (See 2c, *supra*) The February 2017 - February 2018 IEP proposed that Estella receive direct speech-language services 3 hours per month targeting the language skills necessary to support

[11] Dr. Imber and Ms. Flax have been involved with Estella's family for more than a decade, providing direct services, evaluations and on-going consultations. Both have been consistent participants in Team meetings and have provided testimony at previous BSEA Hearings.
[12] Repeat Standardized testing of intellectual potential using a variety of measures showed cognitive functioning remained in the low to mid 70s consistent with previous diagnoses. (P-64; S-25)

her participation in community vocational placements. To address the Parents' desire that Estella pass the MCAS, the IEP noted that she could participate in Natick's after school MCAS math preparation course beginning in April 2017, and use the computer-based "gradpoint" MCAS prep program available at any time and place, with support from ACHIEVE teachers during the school day. The IEP also provided for continued academic and speech/language services during summer 2017. (P-22) On March 17, 2017 the Parent rejected the proposed February 2017-February 2018 IEP. (P-31)

4. <u>MAY 2017 – MAY 2018</u>

a)      Sometime after March 17, 2017 Mr. E. became aware that Estella would complete the Learning Prep post graduate experience before the end of Natick's school year. On April 10, 2017 he advised Natick of his intent to re-enroll Estella in Natick beginning on June 5, 2017. He told Natick that he expected Estella to receive special education services through the end of the Natick school year and during the summer of 2017. (P-15M) Mr. E. did not rescind his rejection of the February 2017-February 2018 IEP. He wrote that he expected Natick to develop an appropriate plan including services to help Estella pass the math portion of the MCAS and to pursue her interest in Cosmetology. (Mr. E.; P-15M) Natick immediately arranged for a Team meeting to plan for Estella's return to Natick programming. (S-21) On April 28, 2017 the family's attorney sent in an agenda for the meeting outlining the Parents' concerns: math MCAS preparation; vocational programming; ESY program. (S-20)

b)      The Team reconvened on May 10, 2017. Mr. E., his attorney, Ms. Martucci, Steven Imber and Suzanne Flax attended. The Team discussed general education math curriculum and courses, math MCAS preparation classes and tutoring, MCAS appeal procedures, ESY services, connections with adult disability service agencies, alternate vocational public school programs, possible job placement sites through the ACHIEVE program and procedures necessary for reenrollment in Natick and placement in the ACHIEVE program. The family was advised that in order to start receiving Natick special services Estella would have to be enrolled in Natick and the proposed IEP and placement had to be at least partially accepted. Mr. E., Ms. Martucci and Steven Imber participated actively in all phases of the Team discussion. (P-40; P-24, Mr. E.; Molinari-Bates; Brown)

c)      On May 15, 2017 Natick proposed an IEP which was substantially similar to those it had proposed after the September 2016 and February 2017 Team meetings. The May 2017-May 2018 IEP called for Estella to follow a transition-age, functional academic/vocational preparation program through placement in the ACHIEVE program. The IEP added one hour per week of supplemental MCAS math tutoring. The Team noted that it would re-convene at the end of October 2017 to review data obtained from Estella's participation in the ACHIEVE program during the first quarter of the school year and to refine goals, services and placements if necessary. Natick also made a formal Ch.688 Referral to the Department of Developmental Services. (P-24)

d)      Katie Brown, Transition Coordinator for Natick, contacted Learning Prep shortly after the May Team meeting to gather additional information about Estella's functioning in community vocational placements. Ms. Brown learned that Estella was very motivated and

could work independently once she knew the expectations. The Learning Prep job coach, who had worked with Estella for two years, also remarked that Estella lost focus on rote tasks, had difficulty solving unexpected problems, and did not smoothly or independently transition from one discrete task to another. (Brown; P-16A; P-50; P-54; P-151)

e)      After the Team meeting Mr. E. completed the necessary re-enrollment paperwork for Estella. (P-15 Q, R, S, T, V)  On May 24, 2017 Mr. E. advised Natick that Estella would not return to Natick for the balance of the 2016-2017 school year. (P-15R)  On June 11, 2017 Mr. E. rejected the proposed May 2017-May 2018 IEP and placement. (S-9, P-33)  On June 27, 2017 the Parents filed this appeal at the BSEA.  (Administrative Record; see Procedural History *infra*)

f)      Estella did not attend the ESY services offered through Natick during the summer 2017. She participated in an internship arranged by the Massachusetts Rehabilitation Commission. (Mr. E., Brown; P15I)

g)      At a prehearing conference held on August 7, 2017 the Parties agreed that Estella would participate in an extended evaluation at the ACHIEVE program beginning in September 2017. (P-17, S-17)  The evaluation would address three discrete questions: what soft skills did Estella need in order to work?; what vocational sites best suited Estella's interests and skills?; and what supports does Estella require for a successful community job placement? (Brown) In September 2017 Estella began attending the ACHIEVE program in order to participate in the extended evaluation.  ACHIEVE staff reported that she was positive and engaged during all ACHIEVE services.  Mr. E. reported that she was unhappy while attending ACHIEVE. (Miller; Butterfield; Brown; Mr. E.)

h)      Ms. Brown continued to explore work and learning opportunities for Estella in her area of greatest interest: hair and make-up.  On October 10, 2017 Ms. Brown alerted the Parents about Cosmix, a commercial cosmetology training program leading to state licensure as a cosmetologist. (P-15J)  Cosmix did not require students to have a high school diploma before or during enrollment.  Cosmix is located in a nearby town.  (Brown)  Estella and her Parents explored Cosmix and decided to enroll full-time in its 1000 hour training program.  Mr. E. did not give advance written notice of intent to unilaterally enroll Estella in Cosmix.  He did not directly request public funding for that placement. (Mr. E.)  Estella began attending Cosmix for full days, Monday through Thursday.  On Fridays she attended the ACHIEVE program. (Brown; Mr. E.)

i)      Nicole Corliss-Judson, owner of Cosmix, described the private program as a 1,000 hour text and experiential learning program that meets state guidelines for instructional hours and content.  Individuals who complete the required instructional hours are eligible to take the state's cosmetology licensure examination.  A high school diploma is not required.  The program offers a great deal of flexibility.  A student may attend part-time, part day, part week and take as long as necessary to complete the required hours.  The program is not certified or staffed to provide special education instruction or accommodations.  It does not offer instruction in functional math, reading or other academic subjects.  There are 12-20 students, ages 17-60 years old, at any one time.  Cosmix has 3 instructors.  (Corliss-Judson)

Ms. Corliss-Judson described Estella as a hard-working, punctual student who displays initiative and a positive attitude. She typically earns a passing grade in the 75 point range on unmodified written tests. She works appropriately on the floor, engages with clients and has good overall social skills. Estella does learn more slowly than other students, particularly with the physical tasks, but can follow multistep directions, make one-to-one mathematical calculations and handle constructive criticism. (Corliss-Judson)

5.    OCTOBER 2017 – OCTOBER 2018

The Team re-convened on October 31, 2017 to discuss the extended evaluation and placement at ACHIEVE. By that time Estella was attending ACHIEVE only on Fridays. Estella, both her Parents, their lawyer, Steven Imber and Suzanne Flax actively participated in the Team meeting. All posed questions, made comments and suggestions, requested clarifications. None was interrupted or cut off by Natick staff members.[13] (P-36) The Team discussed Estella's attendance at ACHIEVE and Cosmix, MCAS tutoring and appeals, functional academic and computer-based instruction, grad point and moneyschool web learning programs, and vocational options, among other things. The Team considered the extended evaluation report produced by Natick and discussed the answers to the agreed upon evaluation questions. The Team concluded, consistent with reports from Learning Prep School, that Estella could benefit from continued direct speech-language services geared toward improving social and job related communication skills and from community vocational placements with supports in following multistep directions, task initiation and asking for help when needed. (Brown; Molinari-Bates; Butterfield; P-70; S-14)

The Parents asked that Natick develop an IEP for an ACHIEVE placement one day a week that would accurately reflect Estella's attendance at Cosmix. (Mr. E.; P-98) Natick indicated that it would continue to offer Estella a five day per week program and placement at ACHIEVE to work on functional academic and vocational skills, with direct speech-language therapy to address weaknesses in job-related language needs, the services of a job coach to address Estella's community support needs and individual MCAS tutoring at the end of the school day. (S-14; Butterfield; Miller) Natick stressed that while Estella was welcome to attend ACHIEVE part time and pursue other learning opportunities at her own time and expense, the Team had determined that Estella could benefit from full time attendance at ACHIEVE so no less than that would be offered. (P-36; S-14) Natick does not provide personnel or financial support to students in privately arranged commercial learning programs and does not include goals/objectives related to those private experiences on student IEPs because Natick cannot enforce or monitor specialized instruction in such settings. (Miller; Brown)

The Parents rejected the changes to the 2017-2018 IEP proposed by Natick at the October 31, 2017 Team meeting. (P-101; S-12)

6.    FEBRUARY 2018 – FEBRUARY 2019

a)    The Team re-convened on February 6, 2018 for an annual review. Estella, her Parents, their lawyer, Steven Imber and Suzanne Flax attended. Estella, Mr. E., Ms. Martucci, Dr. Imber

---

[13] The family also maintained a healthy e-correspondence with Natick. See eg: S-35; S-16; S-13; S-10, P-15; P-16

and Ms. Flax all participated actively in the Team discussion, asking and answering questions, making suggestions, clarifying and commenting on reports and observations of Natick personnel, and making their desires and preferences known.  The Team discussed: functional and community math skills instruction; MCAS math preparation, MCAS appeal procedures; MCAS math tutoring; Estella's desire for and progress toward a High School diploma; development of functional communication skills; participation in a community based health/beauty vocational placement, Spavia, through the ACHIEVE program; participation in the Cosmix training program, and proposed goals and services for the IEP. (P-37; Luff; Mr. E.; Miller)

b)	Natick proposed an IEP calling for direct special education services with a transition-based, functional academic curriculum and vocational training within a full time placement in the ACHIEVE program.  The IEP also proposed that Estella receive direct speech-language services to address weaknesses in the social skills and problem solving skills needed to function independently in work and community settings.  Three hours per week of individual math tutoring to be targeted at preparation for the re-take of the math component of the MCAS was added to the IEP.  MCAS tutoring would take place during the school day at the Parents' request.  The IEP emphasized Estella's interest in working in the health and beauty field and continued a vocational placement at Spavia and the services of job coach.  It eliminated ESY services. (S-5)

c)	The Parents rejected the proposed 5 day placement at ACHIEVE.  They requested that the IEP be written to include a four day per week placement at Cosmix and a one day per week placement at ACHIEVE.  They rejected the functional academic curriculum and requested academic preparation solely to re-take the MCAS or to prepare an MCAS appeal portfolio.  They objected that no non-disabled peers attend the ACHIEVE program. (S-7; Mr. E.; P-102)

d)	In March 2018 the family informed Natick that Estella would no longer attend the functional academic, communication skills or math tutoring components of her Friday placement at ACHIEVE. Estella had not attended ACHIEVE since the 1st week of March.  She would continue to participate in her vocational placement at Spavia. (S-4; P-35)

e)	The Team re-convened on May 30, 2018 at the Parents' request "to revise [Estella's] Career Preparation and discuss options for extended year services."  Estella, Mr. E. and the Transition Coordinator, Ms. Brown, discussed Estella's Spavia placement.  Estella asserted that she did not enjoy Spavia.  Mr. E. claimed that Estella's inability to remember some task procedures was evidence of "substantial regression" qualifying her for extended year services.  Ms. Brown reported that some of Estella's work skills were solid and that she continued to need support with situational problem solving tasks and some placement specific procedures.  Ms. Brown pointed out that Estella could derive greater benefit from the career support and preparation available at ACHIEVE were she to attend five days a week.  She urged Estella to at least resume attending ACHIEVE on Fridays.  Natick noted the lack of data to support a finding that Estella's functional academic and vocational transitional skills would likely regress without targeted special education services over the summer break, as Estella had not taken advantage of those instructional opportunities available to her throughout the 2017-2018 school year. (P-35)

f)	Estella stopped attending the Spavia placement in May 2018. (P-35; S-2; M. E.)  She did not participate in any special education services offered by Natick after May 2018.

7.    FEBRUARY 2019 – MARCH 2019

The February 2018-February 2019 IEP proposed by Natick expired on February 5, 2019. In December 2018 the Parties agreed that Natick would offer an extension of an identical IEP to cover the time between February 5, 2019 and Estella's 22nd birthday in March 2019.  On January 10, 2019 Mr. E. rejected the proposed continuation of the transitional functional academic, life skills and vocational instruction in the ACHIEVE program.  He wrote that Estella was successfully engaged in a general education vocational training program with non-disabled peers. (P-103)

CONCLUSIONS OF LAW

There is no dispute that Estella was, at all times pertinent to this Decision, a student with special learning needs entitled to receive a free, appropriate public education under 20 U.S.c.§1400 *et seq* and M.G.L. c.71B.  Nor is there any dispute about the nature or scope of Estella's learning disabilities.  The Parties disagree about the type and location of specialized services appropriate to address Estella's learning needs.  After careful consideration of the evidence presented at Hearing, and the thoughtful arguments of counsel for both parties, it is my determination that the Parents have failed to carry their burden of proving that the IEPs Natick developed for Estella between 2016-2019 did not provide her reasonable access to a free appropriate public education.  On the contrary, I find that the Natick Teams from September 2016 through May 2018 were appropriately composed, responsive to Parental concerns and participation, and resulted in IEPs that reflected both Parental service requests and best available educational practice for Estella.  While, for clarity, each issue is addressed separately below it is important to note several common themes.  Rather than repeating them for each issue, the reliability and credibility findings, as well as examination of the Parents' overarching procedural arguments, are discussed at the outset.

First, I do not rely on the testimony of Dr. Imber or Ms. Flax.  Both have operated over many years more as family advocates than as dispassionate expert evaluators.  The written reports of their formal testing appear valid and useful.  Their hearing testimony, on the other hand, was internally inconsistent, inconsistent with some of their earlier reports and assertions in Team meetings, and generally lacked other traditional indicia of trustworthiness.  Similarly, the testimony of Mr. E. was frequently at odds with his prior written communications and with the record of his participation in Team meetings. (P-36-P-40)
I found that Mr. E. appeared to be motivated more by a desire to obstruct Natick's efforts to address Estella's remaining functional gaps than to actually address them.  Therefore, I accord his testimony little weight.  On the other hand, I found the witnesses for Natick to be uniformly candid, consistent and knowledgeable about Estella and her goals and challenges.  I further found Mr. Luff, Ms. Molinari-Bates, Ms. Miller and Ms. Brown, in particular, to be flexible and patient

in interactions with Estella's family, genuinely interested in crafting workable solutions to meet Estella's needs and wishes, and, critically, professionally and personally credible. I, therefore, accord their testimony significant weight. They uniformly endorsed the IEPs Natick had developed for Estella between September 2016 and February 2019. Each testified that the ACHIEVE program offered to Estella through those IEPs could meet her identified academic, vocational, life skills and transitional needs as a post-high school student. There is no substantial, credible evidence in this record to the contrary.

Second, the Parents' claim that Natick violated their procedural rights by "forcing" them to sign a settlement agreement during the August 2017 pre-hearing conference is disingenuous to say the least. (See paragraph 4g) At the time, the Parents had significant experience with the BSEA's procedures and events, were familiar with, and accustomed to asserting, due process protections at the district, administrative and judicial levels, and were represented by their long-standing counsel. I find their claim of duress to be unsupported in the record.

Third, the Parents' claims that Natick continually failed to consider their input during the IEP planning process and that Natick had predetermined the services and placement it proposed for Estella based on inadequate or inaccurate information, are not supported by any credible evidence in the record. On the contrary, the substantial weight of the evidence shows that Natick school staff were uniformly receptive and responsive to the concerns and suggestions of the parents, the Student, their attorney and the two Parent consultants at all stages of the IEP development and implementation process throughout 2016-2019. The transcripts of the Team meetings, the IEPs and the email correspondence demonstrate that Natick personnel consistently, carefully, courteously, cogently, repeatedly and timely explained the reasoning behind each professional choice of educational service and placement reflected in the proposed IEPs. No more is required.

Fourth, the Parents asserted that Natick's IEPs paid insufficient attention to preparing Estella to retake and pass the math component of the MCAS, a precondition for award of a sought after high school diploma. Standardized testing available to the Teams consistently placed Estella's math skills at the $1_{st}$-$2_{nd}$ grade level. There is no evidence of higher level skill acquisition after three years of targeted MCAS math preparation at Learning Prep. There are no credible expert educator recommendations that Estella continue to prepare for MCAS. Nevertheless Natick honored the Parents' request for MCAS related services by offering Estella a variety of options to continue to prepare for and retake the math MCAS: individual tutoring during and after school; MCAS prep classes and computer assisted independent and/or supported learning activities. Of these Estella chose to participate only in the school day tutoring during the limited time she attended ACHIEVE. Could Natick have offered different or more intensive math services to Estella? Perhaps. Was Natick obligated to do so? No. There is no evidence to support the conclusion that Estella could derive a meaningful educational benefit from such services.

Finally, the Parents contended that Natick's refusal to offer a one day per week placement at the ACHIEVE program denied Estella a free appropriate public education. The clear weight of the evidence demonstrates that the Natick Team proposed IEPs calling for a five day per week ACHIEVE program because, in the best judgment of the professional educators,

attendance for the entire school week would offer Estella the greatest educational benefit. Natick was not required to offer an IEP calling for a one day per week special education program merely to suit the Parents' chosen schedule for Estella. Indeed it could not, as the Team had reached the conclusion that attendance at ACHIEVE for only one day per week would not meet Estella's special education needs. Nevertheless, at no point did Natick prevent Estella from attending ACHIEVE once per week according to her preferred schedule. Nor did it in any way prevent her from pursuing a commercial learning program on the same basis as her non-disabled peers.

RESOLUTION OF ISSUES:

1.    a)    Whether Natick's failure to propose an IEP for Estella for the 2015-2016 school year impeded the Parents' ability to participate meaningfully in educational planning for Estella?

Yes. Natick admits that it did not convene a Team meeting to plan for, or develop an IEP to implement during the 2015-2016 school year. Parent participation in the TEAM and in the development of an IEP is a fundamental procedural guarantee of the IDEA. It is axiomatic then that failure to include Parents in the Team process and failure to propose an IEP for a known IDEA-eligible student for a full school year violates the procedural rights of the parents and the student. While it is clear that, at the time, the Parties were exhausted by years of bitter litigation and may have relied on the "stay put" placement resulting from the BSEA's July 2015 Decision, these factors go to the equities rather than to the existence of the procedural violation.

1.    b)    Whether Natick's failure to propose an IEP for Estella for the 2015-2016 school year caused substantive education harm for which Estella is entitled to compensatory services?

This question has two answers. First, there was no showing that Estella suffered any educational harm as a result of Natick's failure to propose a 2015-2016 IEP. In July 2015 the BSEA had found that Natick's ACCESS program offered Estella a free appropriate public education and that the Parents' unilateral placement at Learning Prep did not warrant public funding.[14] The ACCESS program was the operative "stay-put" placement for Estella. It was available to her at any time during the 2015-2016 school year. The Parents elected not to take advantage of the ACCESS program and to continue Estella's private placement at Learning Prep for the 2015-2016 school year. Although they had given Natick timely required notice of unilateral placements in earlier years, and despite being represented by counsel at all times, the Parents did not advise Natick of their choice to enroll Estella in Learning Prep for the 2015-2016 school year. Natick was, therefore, entitled to presume that Estella would attend the ACCESS program during the 2015-2016 school year. Based on those facts I find that an appropriate, publicly funded special education program was available to Estella at all times throughout the 2015-2016 school year and that she did not suffer any educational harm as a result of Natick's procedural misstep.

Typically that would conclude the inquiry. Here, however, failure to produce an IEP is so significant and fundamental a procedural misstep that some remedy is warranted. Given the equities in this particular appeal: on the one hand, the multi-year history of disputed IEPs; the

14 *Student and Natick Public Schools*, 14-08860, July 24, 2015.

consistent administrative and judicial decisions favoring Natick's position;  the Parents' federal court appeal of the BSEA's July 2015 Decision; the tenor and temperature of the Parents' written communications with Natick and their participation along with that of their advocates in multiple Team meetings, and on the other hand, the existence of an appropriate "stay put" placement; the lack of a showing of substantive educational impact on Estella; the Parents' failure to give Natick required notice of unilateral placement and the responsiveness of the Natick Team to the Parents' frequent, and frequently confusing, communications, Natick's failure to clarify and memorialize its proposal for the 2015-2016 school year is understandable, but still wrong.  These factors, combined with my assessment of the actions and of the credibility of the Parents and the Parents' advocates/witnesses, lead me to conclude that an appropriate sanction for the procedural violation is one that results in somewhat limited relief for the Parents.

As recompense for its failure to hold a Team meeting for, or to develop an IEP for, the 2015-2016 school year, Natick shall reimburse the Parents for actual tuition paid to Learning Prep as a result of Estella's enrollment there during the 2015-2016 school year.
While this compensatory remedy does not represent month to month equivalency for the 15 months Estella lacked a Natick proposed IEP, an award of reimbursement for private school tuition for a full school year is a significant penalty for a significant procedural violation. Additional remedies requested by the Parents are not warranted by the equities.  The lapse was unintentional.  There was no correlative educational harm to Estella.  The Parents' hands were not entirely clean during the pertinent period.  Therefore, I find that the relief awarded to the Parents is appropriate compensation for the extent of the harm and is sufficiently weighty to serve as a deterrent to this type of procedural oversight by this school district and others.

2.      a)      Whether Natick impended the Parents' ability to participate meaningfully in the Team meeting held on September 26, 2016?

No.      Transcripts of the Team meeting show that Mr. E. and the family's attorney participated in all aspects of a thorough Team discussion.  Natick Team members testified credibly and consistently that Mr. E.'s concerns were taken seriously and were addressed. Mr. E's testimony to the contrary is unsubstantiated.  There is no evidence of a procedural violation that could be plausibly linked to the September 2016 Team meeting process or to the development of the 2016-2017 IEP for Estella.

2.      b)      Whether the September 2016-September 2017 IEP Natick developed as a result of that meeting was reasonably calculated to provide a free appropriate public education to Estella in the least restrictive environment?

Yes.      As a result of the September 2016 Team meeting Natick proposed an IEP for Estella that would provide special education services in areas identified by her evaluators, teachers and vocational supervisors as needing remediation.  These areas, incompletely addressed at Learning Prep, included: development of functional academic skills; development of language and communication skills necessary to support independent work and community participation; improvement in practical living skills; and exposure to preferred vocational interests.

Since Estella had completed Learning Prep's high school program, Natick proposed that Estella receive special education services through the ACHIEVE program which is designed to provide flexible, individually tailored educational, communication, and vocational services to students who have completed high school.[15] Through ACHIEVE Estella could continue to work toward completion of testing requirements for award of a Natick High School diploma, acquire functional math and adaptive living skills necessary to support independent living and engage in supported work experiences in her chosen vocational field, beauty. The Parents objected to Estella's placement at ACHIEVE because: the other students didn't look like her, there was insufficient focus on preparing for the math portion of the MCAS, and there were no typical peer models. (2b; 2c; Mr. E.)

Comparing the proposed 2016-2017 IEP resulting from the September 2016 Team meeting to the written reports of Dr. Imber and Ms. Flax and to the Learning Prep progress reports, it is clear that the IEP incorporates the recommendations of the evaluators and teachers for continued attention to the development of functional academic and communication skills, activity of daily living instruction, vocational preparation and social pragmatics. The IEP provides services targeted to these learning need areas. The proposed placement at ACHIEVE offered Estella access to flexible, age appropriate supports, with staff who have expertise working with her transition age group. The ACHIEVE program could also address any missing academic credit or testing necessary to earn a high school diploma.

As a post-high school special education program attendance at ACHIEVE is limited to IDEA-eligible students who have not earned a high school diploma. Typical peers would be found in community experiences, work placements, and college or vocational training programs an ACHIEVE student would access through her IEP. I note also that the 5th year program Estella attended at Learning Prep similarly had no "typical" peers.

Based on the findings outlined above I conclude that the September 2016-September 2017 IEP developed by Natick properly incorporated the educational, vocational and transitional services recommended in the evaluation reports available to the Team. I further find that the preponderance of the credible evidence supports the conclusion that the services proposed for Estella through 2016-2017 IEP were appropriate to address her identified special learning needs, her demonstrated potential, and her individual circumstances. Although the Parents objected to Natick's failure to offer math instruction targeted to improving Estella's math MCAS score, none of the evaluators recommended that service for a 19 year old whose standardized math achievement scores fell at the first percentile. All recommended concentrating instead on developing the functional math skills she would need to move independently in the adult world such as money and time management. The 2016-2017 IEP provided for instruction in those areas, as well as supported access to on-line MCAS preparation programs. It is also important to note that the 2016-2017 IEP would have been implemented in a setting less restrictive than that chosen by the Parents, as it would have afforded Estella an opportunity for social engagement with community age peers within the ACHIEVE program, as well as vocational/independent living/leisure skills training and practice within her home community. All these factors, considered as a comprehensive whole, persuade me that the September 2016-September 2017 IEP proposed by Natick was reasonably calculated to ensure that Estella would derive a

---

[15] 20 U.S.C. §1401 (34); 20 U.S.C. §1414 (d)(1)(A).

meaningful educational benefit, and make measureable educational progress, with the services and in the setting the ACHIEVE program offered.

2.    c)    If not, whether Estella is entitled to compensatory relief?

No.    As the substantial weight of the evidence compels the conclusion that Natick offered Estella an appropriate special education program through the September 2016-September 2017 IEP, and that the Parents had a meaningful opportunity to participate in all aspects of the development of that plan, the Parents have not carried their burden of proving any circumstance that might entitle them to the compensatory relief they request.

3.    a)    Whether Natick impeded the Parents' ability to participate meaningfully in the Team meeting held on February 14, 2017.

No.    There is no evidence to support the Parents' contention that Natick prevented them from participating meaningfully in the February 2017 Team meeting, or in any other way ignored or discounted their on-going contributions to educational planning for Estella.  On the contrary, the record amply demonstrates that Mr. E. was an active participant in the February 2017 Team meeting, as was the family's attorney, as were two longtime Parent consultants. (P-39; P-22) see ¶3)  Natick made some adjustments to the 2017-2018 IEP as a result of the evaluations and Team discussions, particularly in the area of preparing Estella to retake the math MCAS, as advocated by the Parents.  That Natick did not make every language change to the IEP, or include every service,  requested by the Parents does not mean that it failed to include the Parents in the planning process or seriously consider their input.  The record shows that it did.

3.    b)    Whether the February 2017- February 2018 IEP Natick developed as a result of that meeting was reasonably calculated to provide Estella with a free appropriate public education?

Yes.    The February 2017-February 2018 IEP developed by Natick properly incorporated the recommendations of both Natick and parent-secured evaluators for services targeted to improving Estella's functional academic, communication, vocational and independent living skills.  The IEP also included services designed to assist Estella to acquire skills necessary to pass the math component of the MCAS as requested by Mr. E. and Dr. Imber.  The IEP provided for placement in the ACHIEVE program, the community-based, post-high school special education program well known by then to the Parents and their consultants.  Placement at ACHIEVE offered Estella the opportunity to learn and practice appropriate functional academic and transition focused skills in the company of age peers from her home community along with community-based vocational and independent living skills development.  It is important to note that the conceptual framework for "least restrictive environment" once high school has been completed differs significantly from the familiar standard applicable in a school-based setting where typical peers and general education curriculum and activities are the LRE.  After high school the student's home community becomes the "LRE".  As with many of the Student's typical age peers the active educational focus post-high school is on developing the functional and vocational skills necessary to support independent adulthood.  It is using this lens that I conclude that the proposed ACHIEVE placement would have offered Estella appropriate special

education services in the least restrictive environment. The access to group learning with age peers, as well as individual vocational and transitional skills development with typical community peers of all ages, offered Estella the opportunity to make meaningful progress toward the acquisition of academic, social, communication, vocational and independent living skills in her home community.

Therefore, I find, based on the preponderance of evidence introduced at the hearing, that the February 2017-February 2018 IEP developed by Natick would have, if implemented, provided special education services from which Estella could have derived a meaningful education benefit in a setting consistent with the IDEA's preference for the LRE. In short, the substantial weight of the evidence supports the conclusion that the February 2017-February 2018 IEP was reasonably calculated to ensure that Estella received a free, appropriate public education.

3.      c)      If not, is Estella entitled to compensatory relief?

No.      The Parents did not prove the existence of any procedural or substantive errors in connection with the development of the February 2017-February 2018 IEP that might entitle them to compensatory relief.

4.      a)      Whether Natick prevented the Parents from participating meaningfully in the Team meeting held on May 10, 2017?

No.      There is no evidence to support the Parents' contention that Natick prevented them from participating meaningfully in the Team meeting held on May 10, 2017 or in any aspect of the educational planning process that resulted in the re-proposed February 2017-February 2018 IEP. (P-24, see ¶4b) On the contrary, the substantial weight of the evidence demonstrates that Mr. E., the family's attorney, and 2 long-time parent consultants shared their perspectives about a comprehensive roster of services and accommodations with Natick personnel during the Team meeting. In addition, Mr. E. maintained a lively e-correspondence with Natick's special education staff at that time. (P-15) Natick clarified Estella's entitlement to participate in the ACHIEVE program for the remainder of the 2016-2017 school year, and during the summer of 2017, once the Parent accepted some of the offered services. That the Parent declined to accept the proposed services and placement for Estella does not mean that Natick committed any procedural error.

4.      b)      Whether the 2017-2018 IEP developed by Natick as a result of that meeting was reasonably calculated to provide Estella with a free appropriate public education?

Yes.      The IEP resulting from the May 10, 2017 Team meeting was, in all pertinent aspects, identical to the IEP proposed in February 2017. (Cf P-22 and P-24) No new evaluations were presented to the May 2017 Team. No new or different service recommendations were made by any educator or evaluator. No new service requests were made by the family. The only change in circumstance was Estella's impending completion of the Learning Prep post-graduate program. Natick's IEP was re-proposed essentially so that Estella could begin receiving special education services through Natick as soon as she finished Learning Prep. As there was no new

substantive information presented to the Team, no substantive changes to the proposed 2017-2018 IEP were required or made. I find, therefore, that the IEP resulting from the May 2017 Team meeting was, as was its predecessor February 2017-February 2018 IEP, reasonably calculated to provide a free appropriate public education to Estella. It continued to offer the type and level of special education services recommended by educators and evaluators to comprehensively address Estella's well-documented learning needs. It continued to offer those special education services in a community-based setting where Estella would have access to age peers and typical adult community members. It continued to offer Estella an opportunity to make meaningful, measurable educational progress commensurate with her potential and consistent with her rights under the IDEA. There is no persuasive evidence to the contrary.

4.      c)      If not, is Estella entitled to compensatory relief?

        No.     The Parents did not carry their burden of proving the existence of any procedural error or substantive educational injury that might warrant compensatory relief from Natick.

5.      a)      Whether Natick impeded the Parents' ability to participate meaningfully in the Team meeting held on October 31, 2017?

        No.     There is no evidence to support the Parents' contention that Natick prevented them from participating meaningfully in the Team meeting held on October 31, 201or in any other aspect of planning or delivering special education services to Estella in the fall of 2017. On the contrary, the record demonstrates that Estella, both Parents, their lawyer and their long time consultants all participated actively in the Team meeting. (P-36) In addition, the Student and Parents had regular face-to-face, telephone and email contact with ACHIEVE and Natick special education staff throughout the fall 2017 extended evaluation and educational planning process. (P-15; S-16; S-13; S-10; Brown) Their concerns and questions were discussed thoroughly and politely. The fact that Natick declined the Parents' request to write an IEP reflecting only one day per week of participation in the ACHIEVE program rather than the five days per week recommended by educators and evaluators does not indicate that Natick failed to permit the Parents' reasonable access to and participation in the IEP development process and does not constitute procedural error.

5.      b)      Whether the 2017-2018 IEP Natick developed as a result of that meeting was reasonably calculated to provide Estella with a free appropriate public education?

        Yes.    The IEP developed at the October 31, 2017 Team meeting continued the appropriate transition age services and ACHIEVE placement set out in prior versions of the 2017-2018 IEP. As explained above, the February and May versions of the 2017-2018 IEP were responsive to expert educational recommendations and appropriately tailored to meet Estella's special learning needs in the least restrictive setting. In October 2017 the Team added services to meet educational needs newly identified during Estella's participation in an extended evaluation at ACHIEVE during the fall of 2017 as well as to address the Parents' concerns about the use of computer-aided instruction for MCAS preparation. The proposed IEP included 2 hours per week of individual job coaching during community-based vocational experiences, daily after-school individual tutoring to prepare for the math MCAS, and increased attention to

development of job related language and communication skills during group and individual speech-language services. The enhanced IEP appropriately targeted all areas of learning needs identified by educators, while also addressing the Parent's concerns about MCAS preparation methodologies. It offered Estella individually tailored educational services designed to address her need for development of functional academic, communication and vocational skills in a community-based learning environment with regular exposure to similarly situated age peers and typical adults. I find, therefore, that the IEP resulting from the October 31, 2017 Team meeting met the recommendations of expert evaluators for the type and level of special education services appropriate to address Estella's special learning needs and unique personal circumstances and to produce meaningful educational progress commensurate with her potential. I further find that the IEP developed by Natick was carefully designed to be implemented in the least restrictive setting possible while still delivering the necessary specialized educational services. In sum, the IEP developed by the October 31, 2017 Team was reasonably calculated to provide a free, appropriate public education to Estella. There is no persuasive evidence to the contrary.

5.      c)      If not, is Estella entitled to compensatory relief?

        No.     The Parents did not meet their burden of proving the existence of any procedural error or substantive educational injury connected to the development and/or implementation of any of the 2017-2018 IEPs that could reasonably support an award of compensatory relief.

6.      a)      Whether Natick impeded the Parents' ability to participate meaningfully in the Team meeting held on February 6, 2018?

        No.     Estella, her Parents, their lawyer and the 2 long time family consultants all participated actively in the February 6, 2018 Team meeting. The record shows continued Parent and Student communication with ACHIEVE staff and Natick's special education department between the previous Team meeting on October 31, 2017 and the February 2018 meeting. (P-101; S-12; S-10; P-15; Mr. E.; Brown; Miller)  There is no evidence that Natick ignored, limited or discounted the contributions of the Student, the Parents or their advocates during the IEP development process. There is no evidence of any procedural error that could reasonably be associated with the February 6, 2018 Team meeting.

6.      b)      Whether the 2018-2019 IEP Natick developed as a result of that meeting was reasonably calculated to provide Estella with a free appropriate public education?

        Yes.    There were no new evaluations available to the February 2018 Team. However, the Team discussed Estella's changed circumstances: regular attendance at Cosmix, a private beauty academy; acquisition of a driver's license; and declining interest in attending ACHIEVE or participating in community based vocational instruction through ACHIEVE. The Team therefore developed an IEP containing services recommended in previous evaluations: a transition age program of classroom instruction and related services geared toward improvement in functional academic, communication, vocational and independent living skills along with community-based vocational preparation and placements. In response to parental requests the IEP also added three hours per week of individual tutoring targeting preparation for the math component of the MCAS, to be delivered during the school day rather than after school. As with

previous IEPs considered here, the February 2018-February 2019 IEP met the consistent and complementary recommendations of credible expert evaluators and educators. The IEP outlined a set of educational services that were specifically tailored to address Estella's unique learning needs and personal circumstances, and to provide a meaningful, measurable educational benefit to her. The ACHIEVE program's community-based educational services also would have permitted Estella to learn and practice academic, communication, vocational and independent living skills within her home community as contemplated by the IDEA. Therefore, I find that the February 2018-February 2019 IEP was reasonably calculated to provide a free, appropriate public education to Estella. There is no persuasive evidence to the contrary.

6.    c)    If not, is Estella entitled to compensatory relief?

No.    The Parents did not meet their burden of demonstrating by a preponderance of the evidence the existence of any circumstance, procedural or substantive, that might reasonably support a claim for compensatory services. On the contrary, the balance of equities in this matter weighs heavily in Natick's favor.

7.    a)    Whether the final IEP proposed by Natick, covering the period of February 2019 through the date of Estella's 22nd birthday in March 2019, was reasonably calculated to provide Estella with a free, appropriate public education?

Yes.    The final February-March 2019 IEP was developed without a Team meeting by agreement of the parties. The IEP provided the services and setting identical to those offered to Estella under the previous IEP, also by agreement of the Parties. It, in essence, extended the February 2018-February 2019 IEP a few additional weeks in order to cover the brief remaining period of Estella's IDEA-age eligibility.

In February 2019, Estella's circumstances had not changed in any significant way since the last Team meeting had been held in May 2018. She had not participated in any services, programs, tutoring or community placements available to her through the 2018-2019 IEP and ACHIEVE program. She continued to attend the cosmetology licensure program at Cosmix. There were no new evaluations or progress reports for the Parties to review. Therefore, having found that its predecessor IEP was appropriate for Estella, I find that the February-March 2019 IEP extension was similarly appropriate for her. As with the earlier IEP, the 2019 IEP extension contained the educational and related services consistently identified as necessary for Estella to make meaningful educational progress in light of her unique circumstances and potential. The IEP provided for the delivery of those special educational services in the least restrictive setting within Estella's home community. There being no persuasive evidence to the contrary, I therefore, find that the February 2019-March 2019 IEP was reasonably calculated to provide a free, appropriate public education to Estella.

ORDER

Based on the findings outlined above, I conclude that the Parents have proved by a preponderance of the evidence that Natick violated their IDEA rights to meaningful participation in the development of a 2015-2016 IEP for Estella. As equitable compensation for the procedural violation, in keeping with the 1st Circuit Court of Appeals guidance in *Roland M. v. Concord School Committee*, 910 F.2d 983 (1st Cir. 1990), Natick shall, within 90 days of the date of this Decision, reimburse the Parents for tuition they paid to Learning Prep School in connection with Estella's attendance there during the 2015-2016 school year.

I further conclude that the Parents have not met their burden of proving by a preponderance of the evidence the existence of any other alleged procedural violation which might warrant relief.

Finally, I conclude that the Parents have failed to show by a preponderance of the evidence that the IEPs proposed by Natick for the 2016-2017, 2017-2018 and 2018-2019 school years were not reasonably calculated to provide Estella with a free appropriate public education. On the contrary, clear and convincing evidence demonstrates that all preferred IEPs were developed during Team meetings in which the Parents had a meaningful opportunity to participate, reflected the uniform recommendations of expert educators, offered Estella individually tailored services designed to provide a meaningful educational benefit to her and to allow her to make educational progress commensurate with her potential, age, goals, interests and other personal circumstances and placed those services in the least restrictive, community-based, setting consistent with her transition age and goals in accordance with standards set out in *Endrew F. v. Douglas County School Dist.*, 580 U.S.__, 137 S. Ct. 988 (2017) and *C.D. v. Natick*, No. 18-1794 (1st Cir. May 22, 2019). Therefore, the Parents' request for additional relief is DENIED.

By the Hearing Officer

_____

Lindsay Byrne
Dated: August 29, 2019