UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 19-12427

C.D., by and through her PARENTS
and NEXT FRIENDS, M.D. and P.D.,
and M.D. and P.D., for themselves

v.

NATICK PUBLIC SCHOOL DISTRICT;
TIMOTHY M. LUFF, Assistant Superintendent,
Natick Public School District; BARBARA
MOLINARI-BATES, Evaluation Team Leader,
Natick Public School District; and BUREAU OF
SPECIAL EDUCATION APPEALS

MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT

December 22, 2020

STEARNS, D.J.

Plaintiffs C.D., by and through her parents and next friends, M.D. and

P.D.; and M.D. and P.D. (Parents) filed the instant action seeking judicial

review of an administrative decision of the Massachusetts Bureau of Special

Education (BSEA). Specifically, they appeal the portion of the BSEA decision

determining that (1) Natick Public School District and two of its employees,

Assistant Superintendent for Student Services Timothy Luff and Evaluation

Team Leader Barbara Molinari-Bates, acting in their official capacities

(collectively, Natick) did not impede Parents' ability to participate in several

meetings regarding C.D.'s education, and (2) that the Individual Education Plans (IEPs) proposed by Natick for the 2016-2017 through 2018-2019 school years were reasonably calculated to provide C.D. a free and appropriate public education (FAPE) in the least restrictive environment (LRE), as required by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400, *et seq.*, and Mass. Gen. Laws ch. 71B (Chapter 71B).  Natick cross-appeals the portion of the BSEA decision determining that plaintiffs are entitled to tuition reimbursement for private school placement during the 2015-2016 school year given Natick's failure to propose an IEP or conduct a Team[1] meeting for that year.

Plaintiffs and Natick move for summary judgment on their respective appeals.[2]  BSEA opposes their motions and seeks entry of summary

---

[1] Natick conducts Team meetings to discuss and develop IEPs for students with intellectual disabilities.  In C.D.'s case, the "Team" attending the meetings typically consisted of Parents, Barbara Molinari-Bates (Evaluation Team Leader), Katie Brown (Transition Coordinator), Erin Miller (Assistant Direct of Student Services), Sara Karian (Speech/Language Pathologist), Timothy Luff (Assistant Superintendent for Student Services), Alisia St. Florian (Attorney for Natick), and Laurie Martucci (Attorney for Parents and C.D.).  *See*, *e.g.*, A.R. at 1197, 1454, 1795, 1800.  Occasionally, special education and general education teachers, C.D. herself, or specialists in particular areas of evaluation would also participate.

[2] Natick also cross-moves for summary judgment on plaintiffs' appeal.

judgment in its favor.   For the following reasons, the court will deny plaintiffs' and Natick's motions for summary judgment and enter judgment affirming the BSEA decision.

## BACKGROUND

C.D. is a friendly, cheerful, and hardworking young woman with a borderline intellectual disability and deficits in receptive and expressive language.   The parties do not dispute that she qualified as a student with learning disabilities eligible for special education and related services under the IDEA and Chapter 71B between June of 2015 and March of 2019.

### *Educational History Prior to the 2015-2016 School Year*

C.D. attended public school in Natick through the 2008-2009 school year (fifth grade) pursuant to IEPs proposed by Natick and at least partially accepted by Parents.  In 2009, however, Parents rejected Natick's proposed IEP for the 2009-2010 school year (sixth grade), which would have placed C.D. in a substantially segregated ACCESS program for her academic classes. They instead enrolled C.D. in Christa McAuliffe Regional Charter Public Middle School (McAuliffe), where she could attend at least some of her classes integrated with general education students.   C.D. remained at McAuliffe through the 2011-2012 school year (eighth grade).

3

Following C.D.'s graduation from McAuliffe in June of 2012, Parents requested an IEP from Natick for the 2012-2013 school year (ninth grade). Natick again proposed placing C.D. in an ACCESS program for her academic classes. Parents rejected this proposal and notified Natick of their intent to unilaterally place C.D. at Learning Prep School (LPS), a "special education day school which offers specialized instructional services solely to students" with documented language or learning disabilities. A.R. at 380. C.D. remained at LPS for the 2013-2014 and 2014-2015 school years (tenth and eleventh grades). During this time, Natick developed several additional IEPs for C.D., which Parents rejected.[3]

### 2015-2016 School Year

When C.D.'s IEP for the 2014-2015 school year expired on June 13, 2015, Natick failed to propose any replacement, leaving C.D. without an IEP for the 2015-2016 school year (twelfth grade). Parents re-enrolled C.D. in LPS. They "did not notify Natick of their election to continue [C.D.'s]

---

[3] In a previous due process hearing, plaintiffs challenged whether these IEPs were reasonably calculated to provide C.D. a FAPE in the LRE. The Hearing Officer, the BSEA, this court, and the First Circuit ruled that they were. *See generally C.D., by & through M.D. v. Natick Pub. Sch. Dist.*, 924 F.3d 621 (1st Cir. 2019); *C.D., by & through M.D. v. Natick Pub. Sch. Dist.*, 2018 WL 3510291 (D. Mass. July 20, 2018).

unilateral placement at the Learning Prep School" during this period.  A.R. at 380.

C.D. followed the standard LPS twelfth-grade curriculum during the 2015-2016 school year.  She took and passed courses "in English, History, Science, Math, Career Education, Consumer Skills and Health."  A.R. at 381.  She also passed the English and science components of the Massachusetts Comprehensive Assessment System (MCAS).  She did not, however, pass the math component of the MCAS and thus was ineligible for a high school diploma from the Natick Public School District.[4]

### September 2016 – September 2017 IEP

In June of 2016, town administrators "forwarded a list of students attending private schools at parental expense" to Natick.  A.R. at 381.  C.D.'s name was handwritten at the bottom of this list.   Natick school administrators realized that C.D. did not have an active IEP and determined that they needed to schedule a Team meeting "ASAP."  A.R. at 1602; *see also* A.R. at 620, 816.  Natick scheduled the meeting for September 15, 2016 – a

---

[4] LPS does not award high school diplomas to students unilaterally placed at LPS by their parents.  These students must instead "meet their local school district's high school graduation requirements to earn a diploma issued by the district."  A.R. at 380.

date falling after the beginning of the 2016-2017 school year — citing an alleged policy against scheduling Team meetings during the summer.  At Parents' request, Natick subsequently postponed the meeting to September 29, 2016.

During the meeting, the Team discussed C.D.'s goal of pursuing a career in cosmetology, which Parents believed would require a high school diploma.  The parties considered several options, including having C.D. audit college courses at Framingham State or Mass Bay Community College, *see* A.R. at 2025-2029, 2043-2044, 2060-2061; filing an appeal with MCAS on C.D.'s behalf so that she could obtain waiver of the math component, *see* A.R. 2033-2036; or placing C.D. in the substantially separate ACHIEVE program[5] with an online supplement for math,[6] *see* A.R. at 2030-2032, 2039-2048,

---

[5] ACHIEVE is a post-high school transition program that "focuses on development of independent skills in daily living, community participating, and functional academic."  A.R. at 382.  The program does not have set components but instead is tailored to each student to "meet her individual interests and goals."  *Id.*

[6] This supplement, called Grad Point, supports students needing additional instruction in specific areas.  In the program, a teacher "set[s] up" a student-specific curriculum comprising of online tutorials and guides the student through lessons.  A.R. at 2031.  Natick proposed that C.D. use Grad Point to prepare to retake the math component of the MCAS.

2053-2060, 2061-2063.  Natick ultimately determined that the third option would best suit C.D.'s needs[7] and on September 30, 2017, formally proposed an IEP placing C.D. within in the ACHIEVE program.  Parents rejected this IEP and re-enrolled C.D. at LPS for the 2016-2017 school year.

### February 2017 – February 2018 IEP

C.D. received a series of evaluations[8] in late 2016 and early 2017 in preparation for her three-year reevaluation meeting with Natick.[9]   At this meeting, which occurred on February 14, 2017, the Team discussed the development of a new IEP.   Natick acknowledged that Parents' "main concerns are that [C.D.] pass the math MCAS so that she can obtain a high school diploma and . . . transition to a post-secondary program," A.R. at 2104, and reviewed "options for satisfying the math component of the MCAS,

---

[7] Natick explained that the auditing program would not prepare C.D. to take the MCAS (even assuming she was eligible to apply, which was not certain as she was not then enrolled at Natick) and that the MCAS typically did not grant appeals for students in C.D.'s circumstances.  *See* A.R. at 2029, 2035-2036, 2060-2061.

[8] Mark D'Angelo (Special Education Teacher) and Sara Karian (Speech/Language Pathologist) evaluated C.D. on behalf of Natick.  Steve Imber (Independent Evaluator and Consultant) and Suzanne Flax (Independent Speech Therapist) evaluated C.D. on behalf of Parents.

[9] By mutual consent, the parties moved this evaluation up from mid-2017 to February of 2017.

options for academic instruction in settings other than the ACHIEVE
program, options for connections with adult disability service agencies for
vocational preparation and internships and options for transitioning [C.D.]
to the ACHIEVE program before the conclusion of the 2016-2017 school
year," A.R. at 383; *see also*, *e.g.*, A.R. at 2111-2112, 2135-2137, 2145-2150
(discussing "options for academic instruction in settings other than the
ACHIEVE program"); A.R. at 2113-2125, 2128-2130 (discussing "options for
satisfying the math component of the MCAS"); A.R. at 2125-2127, 2130-2135,
2138-2145 (discussing "options for connections with adult disability service
agencies for vocational preparation and internships and options for
transitioning [C.D.] to the ACHIEVE program before the conclusion of the
2016-2017 school year").   Natick ultimately proposed an IEP that would
place C.D. in the ACHIEVE program and provide her with additional
instruction in math through Grad Point and in-person MCAS prep classes.
Parents rejected this IEP on March 17, 2017.

### May 2017 – May 2018 IEP

Because C.D. was set to complete the LPS post-graduate experience
before the end of the Natick school year, Parents emailed Natick on April 10,
2017, stating that they "ha[d] decided to re-enroll [C.D.] in Natick Public

8

School District" for the remainder of the 2016-2017 school year and the summer.  A.R. at 1605.  In anticipation of C.D.'s re-enrollment, the Team met on May 10, 2017, to develop an IEP.  During this meeting, the Team discussed "general education math curriculum and courses, math MCAS preparation classes and tutoring, MCAS appeal procedures," Extended School Year services, "connections with adult disability service agencies, alternate vocational public school programs, possible job placement sites through the ACHIEVE program[,] and procedures necessary for reenrollment in Natick and placement in the ACHIEVE program."[10]  A.R. at 384; *see also* A.R. at 2185-2211 (discussing "general education math curriculum and courses" and "MCAS appeal procedures"); A.R. at 2214-2218 (discussing Extended School Year services); A.R. at 2212-2213, 2218-2223 (discussing "math MCAS preparation classes and tutoring"); A.R. at 2225-2240 (discussing "connections with adult disability service agencies, alternate vocational

---

[10] For example, when Parents expressed the desire to pursue an MCAS appeal, Natick explained their options at length.  And when the parties agreed that a portfolio appeal, which involved "submit[ting] a portfolio of the student's current and/or punitive work in [the] content area of the appeal," A.R. at 2194, was the only viable option for C.D., Natick explained why LPS, rather than Natick, would need to make the requisite filings on C.D.'s behalf.

9

public school programs, [and] possible job placement sites through the ACHIEVE program").

Natick ultimately proposed an IEP placing C.D. in the ACHIEVE program for the remainder of the 2016-2017 school year and the upcoming 2017-2018 school year and placing her in the Extended School Year (ESY) program for the summer.  Natick further indicated that it would provide one-on-one, in-person math tutoring for C.D.  Parents rejected this IEP on June 11, 2017.  Sixteen days later, they filed an appeal with the BSEA.

### October 2017 – October 2018 IEP

Following a pre-hearing conference before the BSEA on August 7, 2017, the parties agreed to place C.D. in the ACHIEVE program for an extended evaluation.  During this evaluation, a Natick employee emailed Parents about Cosmix, a cosmetology training program which did not require a high school degree and could lead to state licensure.  A.R. at 1598.  Parents decided to enroll C.D. in this program full-time, and C.D. began attending Cosmix four days a week and the ACHIEVE program one day a week.[11]

---

[11] The extended evaluation period for the ACHIEVE program had not yet concluded when C.D. enrolled in, and began attending, the Cosmix training program full-time.

The Team met on October 31, 2017, to discuss C.D.'s extended evaluation placement.  Parents requested an IEP that would allow C.D. to attend ACHIEVE one day a week and the Cosmix training program the remaining four days.  Natick indicated that it could not include Cosmix attendance in any IEP because Cosmix was a "separate entity" that Natick could not monitor and its training program was not designed to "address goals and services on an IEP."  A.R. at 1916, 1921.  Natick ultimately proposed an IEP that would place C.D. in the ACHIEVE program five days a week.

On December 2, 2017, Parents partially accepted the IEP.  They agreed to have C.D. attend ACHIEVE on Fridays, receive one-on-one MCAS tutoring, and receive certain vocational and speech and language services.  Parents rejected the remainder of the IEP.

### *February 2018 – February 2019 IEP*

On February 6, 2018, the Team met for an annual review.  Parents again requested an IEP that would place C.D. at the Cosmix training program four days a week and ACHIEVE one day a week.  Natick rejected this request for the reasons discussed in the prior meeting and proposed an IEP placing C.D. in the ACHIEVE program five days a week and giving her one-on-one

math tutoring and the previously-accepted vocational and speech and language services.

Parents rejected the proposed IEP, and in March of 2018, C.D. stopped attending the ACHIEVE program (even on Fridays) or receiving one-on-one math tutoring.  She continued to receive a handful of other services from Natick, including job placement at a spa, for the following months.  These services ended, however, in May of 2018.

### February 2019 – March 2019 IEP

C.D. remained eligible for special educational services until March of 2019, when she turned 22.  Because her prior IEP expired on February 5, 2019, Parents and Natick agreed in December of 2018 "that Natick would offer an extension of an identical IEP to cover the time between" the expiration and C.D.'s birthday.  A.R. at 388.  On January 10, 2019, Parents rejected this IEP.

### BSEA Decision

C.D. and Parents challenged all IEPs developed between 2015 and 2019 in their appeal with BSEA.  After conducting a hearing on the matter, the Hearing Officer determined that plaintiffs had not met their burden of establishing "that the IEPs Natick developed for [C.D.] between 2016-2019

did not provide her reasonable access to a free appropriate public education." *Id.* Instead, she found "that the Natick Teams from September 2016 through May 2018 were appropriately composed, responsive to Parental concerns and participation, and resulted in IEPs that reflected both Parental service requests and best available educational practice for" C.D. *Id.* In reaching this conclusion, the Hearing Officer declined to credit the testimony of Parents or their witnesses, Steve Imber and Suzanne Flax, whom she believed had "operated over many years more as family advocates than as dispassionate expert evaluators." *Id.* She also rejected the suggestion that Natick had prevented Parents from meaningfully participating in Team meetings, noting Natick had engaged in active discussion with Parents and had incorporated the written recommendations of their evaluators (Dr. Imber and Ms. Flax) in proposed IEPs.

The Hearing Officer did, however, determine that plaintiffs had met their burden as to the 2015-2016 school year, in which Natick failed to provide any IEP for C.D. The Hearing Officer noted that, although plaintiffs did not make any showing that C.D. "suffered any educational harm as a result of Natick's failure to propose a 2015-2016 IEP," the "failure to produce an IEP is so significant and fundamental a procedural misstep that some

remedy" was justified.  A.R. at 390.  She determined that the appropriate remedy was "reimbursement for private school tuition for a full school year," explaining that this penalty would account for the significance of the procedural violation while also accommodating the unintentional nature of the lapse and the fact that C.D. did not suffer any tangible harm.  A.R. at 391.

## DISCUSSION

### *Statutory Framework*

"A state receiving federal funds under the IDEA must offer every disabled child within its jurisdiction a FAPE in the least restrictive environment possible."  *Sebastian M. v. King Philip Reg'l Sch. Dist.*, 685 F.3d 79, 84 (1st Cir. 2012); *see also* Mass. Gen. Laws ch. 71B, § 3 (imposing a requirement at the state level that a child with special needs receive a FAPE).  "A FAPE comprises special education and related services – both instruction tailored to meet a child's unique needs and sufficient supportive services to permit the child to benefit from that instruction."  *C.D. by & through M.D.*, 924 F.3d at 624 (internal quotation marks omitted), quoting *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 748-749 (2017); *see also* 20 U.S.C. § 1401(9).  "The primary vehicle for delivery of a FAPE is an IEP."  *Sebastian M.*, 685 F.3d at 84 (internal quotation marks omitted), quoting

*D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 34 (1st Cir. 2012).   In *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988 (2017), the Supreme Court held that an IEP delivers a FAPE if it offers services "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."   *Id.* at 999; *see also id.* at 1001.

A parent dissatisfied with the IEP proposed by a public school system "may demand an administrative due process hearing before a designated state educational agency," here, the BSEA.   *Sebastian M.*, 685 F.3d at 84, citing 20 U.S.C. § 1415(f).   "From there, an appeal of the administrative hearing officer's final decision may be taken to either a federal or state court of competent jurisdiction."   *Id.*, citing § 1415(i)(2)(A).

### *Standard of Review*

"In reviewing the hearing officer's decision, the district court is tasked with [independently] determining the IEP's appropriateness on the basis of the preponderance of the evidence."   *Lessard v. Wilton Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 24 (1st Cir. 2008); *see also D.B.*, 675 F.3d at 35-36 ("[A] district court reviews the administrative record, which may be supplemented by additional evidence from the parties, and makes an independent ruling based on the preponderance of the evidence." (alteration

in original)), quoting *Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm.*, 361 F.3d 80, 83 (1st Cir. 2004).  However, the court's independence "is tempered by the requirement that the court give due weight to the hearing officer's findings."   *D.B.*, 675 F.3d at 36 (omitted quotation marks in original), quoting *Lt. T.B. ex rel. N.B.*, 361 F.3d at 83; *see also Sebastian M.*, 685 F.3d at 85 (noting that "judicial review in IDEA cases" is, in effect, "a bench trial based on a stipulated record," but one in which the court "must nevertheless give due deference to the findings of the administrative hearing officer" (internal quotation marks and citations omitted)).   "As a result, a district court's review 'falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard.'"   *D.B.*, 675 F.3d at 36, quoting *Lessard*, 518 F.3d at 24.

In the context of a motion for summary judgment, because "the procedure is in substance an appeal from an administrative determination," *see Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995); *see also Sebastian M.*, 685 F.3d at 85, citing *Capistrano*, 59 F.3d at 892, "the non-moving party is not entitled to the usual inferences in its favor," *Sebastian M.*, 685 F.3d at 84-85.

## Natick's Motion for Summary Judgment

In its motion for summary judgment, Natick seeks reversal of the portion of BSEA's order requiring it to reimburse Parents for tuition at LPS for the 2015-2016 school year.  For the following reasons, the court denies its request and enters judgment affirming the BSEA decision.

Natick first argues for reversal on the grounds that any award of reimbursement was inappropriate where the Hearing Officer expressly found that C.D. did not suffer educational harm.  But nothing in the language of the IDEA indicates that educational harm is a prerequisite for any award of tuition reimbursement.  Indeed, the only qualification dictated by the statue appears to be that the hearing officer determine that the school district denied the child a FAPE.  *See* 20 U.S.C. § 1412(a)(10)(C); *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 241 (2009*)* (noting that "Clause (i)'s safe harbor explicitly bars reimbursement only when a school district makes a FAPE available by correctly identifying a child as having a disability and proposing an IEP adequate to meet the child's needs").  The Hearing Officer made the requisite finding here, and the court agrees on the merits that the failure to schedule a Team meeting or propose an IEP was a sufficiently significant procedural violation, even in the absence of demonstrable

educational harm, that it had the effect of denying C.D. a FAPE.[12]  *Cf. MM ex rel. DM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 534 (4th Cir. 2002) (declining to find that the failure to provide a formal IEP amounted to denial of a FAPE where the school had attempted to provide a FAPE by conducting two Team meetings in which "her parents had a full opportunity to

---

[12] To the extent Natick asserts that its failure to propose an IEP or schedule a Team meeting did not "seriously hamper[] the parents' opportunity to participate in the formulation process," Defs.' Mot. at 11 (Dkt. # 39), the court disagrees.  As the Hearing Officer noted, "[p]arent participation in" Team meetings and "in the development of an IEP is a fundamental procedural guarantee of the IDEA." A.R. at 390; *see also Forest Grove*, 557 U.S. at 238-239 ("[W]hen a child requires special-education services, a school district's failure to propose an IEP of any kind is at least as serious a violation of its responsibilities under IDEA as a failure to provide an adequate IEP.")  And although it appears that Parents had, in general, obstructed Natick's attempts to provide C.D. with a FAPE, the burden to review the IEP annually falls on the school, and there is no evidence that Parents specifically acted to prevent Natick from proposing a new IEP or scheduling a Team meeting during the relevant period.  *Cf. Pachl ex rel. Pachl v. Seagren*, 373 F. Supp. 2d 969, 977-978 (D. Minn. 2005) (declining to find that a procedural violation amounted to denial of a FAPE where the school offered to meet with the child's parents to develop an IEP and the parents categorically refused its offer).  To the contrary, the record indicates that Parents were active participants in all Team meetings held prior to and after the 2015-2016 school year and thus presumably would have chosen to participate in a Team meeting for the 2015-2016 school year, if given the opportunity.  The court accordingly agrees with the BSEA that Natick's procedural missteps "impeded the Parents' ability to participate meaningfully in educational planning" for C.D. for the 2015-2016 school year and consequently denied her a FAPE.  A.R. at 390; *see also* § 1415(f)(3)(E)(ii).

participate in the development of" an IEP and parents had refused to cooperate).  Consequently, the court declines to reverse the award.

Natick next contends that, because plaintiffs did not inform Natick of their unilateral decision to re-enroll C.D. in LPS, plaintiffs should not, as a matter of equity, have been awarded damages.  The relevant statutory provision, however, does not *require* a hearing officer to reduce an award if a child's parents fail to give the requisite notice of private placement.  *See* § 1412(a)(10)(C)(iii)(I)(bb).  It merely provides that a hearing officer "may" reduce (or deny) the award on such grounds.  And here, the Hearing Officer expressly considered Parents' failure to provide notice – and certain related factors, *e.g.*, Natick's general responsiveness to Parents' communications and the fact that "Parents' hands were not entirely clean during the pertinent period," A.R. at 391 – before finding that the balance of equities supported awarding tuition reimbursement to plaintiffs for the 2015-2016 school year without reduction.  The court agrees with her well-reasoned determinations[13] and accordingly declines to reverse the award of tuition reimbursement.

---

[13] In doing so, the court rejects plaintiffs' suggestion that the Hearing Officer erred in her consideration of certain equitable factors. First, as to the stay-put provision, plaintiffs have not sufficiently explained why the

## *Plaintiffs' Motion for Summary Judgment*

Plaintiffs raise several challenges to the IEPs developed between the 2016-2017 and 2019-2019 school years.[14]   The court sorts these challenges

---

operative placement would not be the ACCESS program, nor have they cited any legal support for their position that the "pendency" of the proceedings under § 1415(j) would not include the timeframe for an appeal.  *See Vallejo Piedrahita v. Mukasey*, 524 F.3d 142, 144 (1st Cir. 2008) ("It is well settled that issues adverted to on appeal in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned." (internal quotation marks and citations omitted)).  Second, as to the lack of notice, even assuming *arguendo* no notice was required here (which the court doubts), the Hearing Officer's consideration of this factor would be harmless where she did not actually reduce the award of tuition reimbursement under § 1412(a)(10)(C)(iii)(I)(bb), but instead merely declined to award further relief.

[14] At the outset, the court rejects plaintiffs' promissory estoppel and retaliation claims.  The promissory estoppel claim is premised on an email Brown sent to Parents stating that she "thought" C.D. could participate in both Cosmix and ACHIEVE if the school was flexible.  A.R. at 1598.  Even assuming a promissory estoppel claim *could* lie against Natick for this email, that claim would fail because the language within the email is too ambiguous to constitute an enforceable promise and no reasonable person would have relied on it.  *See Neuhoff v. Marvin Lumber & Cedar Co.*, 370 F.3d 197, 204 (1st Cir. 2004).  The retaliation claim is premised on Natick employees allegedly acting in bad faith and with deliberate indifference to C.D.'s rights by waiting until September of 2016 to conduct a Team meeting despite realizing that she lacked an IEP in June of 2016.  The relevant employees, however, testified that the meeting was delayed pursuant to the school's usual practice of not scheduling meetings during the summer (i.e., not because of bad faith), and plaintiffs do not offer any convincing evidence to the contrary.  The claim accordingly fails for lack of evidentiary support.

into three general categories.  First, plaintiffs argue that the Hearing Officer erred in determining that Natick had not prevented Parents from meaningfully participating in the creation of these IEPs during Team meetings.  Second, they contend that these IEPs did not provide C.D. a FAPE in the LRE.  Third, they assert that the Hearing Officer erred in crediting Natick's witnesses over plaintiffs' witnesses.

### 1. Meaningful Participation

Plaintiffs suggest that Natick denied Parents their right to meaningfully participate in the development of the IEP by predetermining C.D.'s placement and goals prior to the relevant IEPs meetings.[15]  The record, however, reveals that Parents had ample opportunity to contribute during Team meetings and that Natick carefully considered their concerns before drafting the relevant IEPs.  In the September 29, 2016, Team meeting, for example, Natick acknowledged C.D.'s desire to pursue a career in cosmetology and discussed various options at length with Parents (including auditing courses at Framingham State or Mass Bay Community College or

---

[15] Although plaintiffs cursorily reference all IEP meetings occurring between the 2016-2017 and 2018-2019 school years, they focus the substance of their argument solely on the September 29, 2016, Team meeting.  The court thus finds plaintiffs' claims with respect to the other Team meetings waived as insufficiently developed.  *See Vallejo Piedrahita*, 524 F.3d at 144.

21

filing an appeal with MCAS) before concluding that placement in the ACHIEVE program with supplemental math instruction would best suit C.D.'s needs.[16]  *Cf. Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 858 (6th Cir. 2004) (finding predetermination where, *inter alia*, "the School System steadfastly refused even to discuss the possibility of providing an ABA program" with the parents, despite "impressive results").  That Natick ultimately opted to propose the program it had envisioned for C.D. prior to the September meeting does not, standing alone, indicate that it failed to consider other options.

The court also finds it significant that, in subsequent Team meetings, Natick altered its IEP proposals to accommodate Parents' concerns

---

[16] That discussion included a cogent explanation of why the other options would not meet C.D.'s needs.  For example, Natick explained that auditing classes would not help C.D. prepare for the math MCAS and that, in any event, C.D. would need to enroll as a student in the school district before she could apply for the relevant programs.  Natick also explained that C.D. did not meet the typical requirements for a successful MCAS appeal.  And in future meetings, it elaborated further on this point, noting that, even if C.D. met the requirements, Natick could not file an appeal on her behalf because C.D. was not enrolled in the school district and Natick did not have the requisite documentation.  *See also* 603 CMR 30.05(2)(a) (noting that "[a] performance appeal on behalf of a student," like C.D., who is "enrolled in a public education program that is not part of a school district" shall be filed by "the administrator of the school or program who is equivalent to the superintendent of schools").

regarding the math MCAS.  For example, in February of 2017, Natick offered to allow C.D. to attend in-person MCAS prep classes in the weeks leading up to the May test date; and in May of 2017, Natick offered to provide C.D. with in-person, one-on-one tutoring in math.  That Natick added further math instruction to its IEP proposals over time indicates that it was actively striving to incorporate Parents' desires and had not predetermined the outcome at any given IEP meeting.

## 2. IEP Appropriateness

As a preliminary matter, the court rejects plaintiffs' suggestion that the Hearing Officer applied an incorrect legal standard in determining whether the September 2016 – September 2017 IEP offered C.D. a FAPE.[17]  Even assuming a goal of remediation is inconsistent with meaningful educational progress – a matter about which the court is not convinced – the mention, in a single sentence, that the IEP was designed to "provide special education services in areas identified by her evaluators, teachers and vocational supervisors as needing *remediation*," A.R. at 391 (emphasis added), would

---

[17] Because plaintiffs focus their legal standard argument solely on the September 2016 – September 2017 IEP, plaintiffs have waived any argument that the Hearing Officer applied an incorrect legal standard in her discussion of the other IEPs.  *See Vallejo Piedrahita*, 524 F.3d at 144.

not negate the substance of the Hearing Officer's FAPE analysis, which properly focused on whether the IEP would provide C.D. with meaningful development in several areas, including her "functional academic and communication skills, activity of daily living instruction, vocational preparation and social pragmatics," A.R. at 392.   The Hearing Officer's ultimate finding, moreover – that the services proposed for C.D. "were appropriate to address her identified special learning needs, her demonstrated potential, and her individual circumstances" and were "reasonably calculated to ensure that [C.D.] would derive a meaningful educational benefit, and make measureable [sic] educational progress," A.R. at 392-393 – aligned with the legal standard set forth in *Endrew F.*

As to the contents of the IEPs, the court agrees with the Hearing Officer that they provided C.D. with a FAPE in the LRE.  First, the court determines that the September 2016 – September 2017 IEP adequately addressed and accounted for C.D.'s performance levels and potential.[18]  Natick solicited

---

[18] Because plaintiffs focus their tailoring argument solely on the September 2016 – September 2017 IEP, they have waived any argument of inadequate tailoring as to the other IEPs.  *See Vallejo Piedrahita*, 524 F.3d at 144.

information from Parents and LPS[19] regarding C.D.'s academic achievement, functioning, and future goals prior to the September 29, 2016 Team meeting, and it accommodated this information in its proposal by, e.g., offering supplemental math instruction to help C.D. pass the MCAS and vocational and speech and language services designed to improve C.D.'s performance in areas identified as needing improvement (such as problem solving).[20] Second, the court determines that the services proposed in C.D.'s IEPs were reasonably calculated to ease C.D.'s transition into the community and help her pass the math MCAS.[21]   The focus of the ACHIEVE program is the

---

[19] Although plaintiffs assert that Natick did not request any transcripts from LPS until two days prior to the February 14, 2017 Team meeting, the record indicates that Natick merely requested updated transcripts at this time and that it already had most of C.D.'s transcripts from LPS.

[20] It also made provisions for further evaluations that would build on this information.  For example, Natick proposed moving up C.D.'s three-year evaluation from mid-2017 to the fall of 2016 and having evaluators "conduct a formal observation" of C.D. at LPS.  A.R. at 2050.

[21] In finding that the services in Natick's IEPs were reasonably calculated to help C.D. pass the math MCAS, the court does not mean to imply that any such educational benefit was required.  The Hearing Officer noted that "none of the evaluators recommended [targeted math instruction] for a 19 year old whose standardized math achievement scores fell at the first percentile" – instead, they "recommended concentrating . . . on developing the functional math skills she would need to move independently in the adult world such as money and time management" – and plaintiff does not identify any evidence to the contrary.  A.R. at 392.

25

"development of independent skills in daily living, community participation, and functional academics," A.R. at 382, and from a review of the record, it appears that Natick consistently proposed vocational and speech and language services consistent with this focus.  For example, it found C.D. a job at a spa and provided her with one-on-one coaching with specialists.[22]  As for the proposed supplemental math instruction, the court cannot say that the services offered by Natick were not reasonably calculated to provide C.D. a meaningful educational benefit.  Natick initially proposed that C.D. use Grad Point, an online educational system that inherently included some measure of teacher support, to prepare for the math MCAS.  And after it became clear that Parents were not satisfied with this arrangement, Natick proposed adding other forms of instruction (such as MCAS prep classes or one-on-one tutoring) in subsequent Team meetings.  While it is true, as plaintiffs suggest, that Natick presumably could have done even *more* to ensure C.D.'s academic achievement in math (*e.g.*, providing her with access to a high school Algebra course), schools are only required to provide services

---

[22] The court rejects plaintiffs' argument that the Hearing Officer erred in failing to consider the absence of a specific transition assessment in her decision.  Natick employees testified that they had all relevant information and, in any event, had been conducting the requisite assessments on an ongoing basis, and plaintiffs offer no evidence to the contrary.

reasonably calculated to provide a *meaningful* educational benefit, not services calculated to provide the maximum possible education benefit. *See Endrew F.*, 137 S. Ct. at 999, 1001.  And the court agrees with the Hearing Officer that Natick's proposed services met the requisite standard here.

### 3. Credibility Determinations

Finally, the court declines to overturn the Hearing Officer's credibility determinations.[23]  While Parents highlight several reasons why they believe the Hearing Officer should have credited their witnesses instead of Natick's witnesses, a "hearing officer's credibility determinations are entitled to particular deference," *Doe ex rel. Doe v. Attleboro Pub. Sch.*, 960 F. Supp. 2d 286, 294-295 (D. Mass. 2013); *see also Sebastian M.*, 685 F.3d at 86 ("The valuation of expert testimony is precisely the sort of first-instance administrative determination that is entitled to judicial deference by the district court."), and the administrative record here contains more than enough evidence to support the Hearing Officer's findings.  As to the finding that Dr. Imber and Ms. Flax operated "more as family advocates than as

---

[23] The court also declines to make any adverse inference against Natick based on the removal of Mark Miller as a witness.  Plaintiffs did not object to his removal during the hearing, nor did they request to reopen their case to provide supplemental evidence accounting for his absence.

dispassionate expert evaluators," A.R. at 388, for example, the record indicates, *inter alia*, that Dr. Imber communicated with plaintiffs' counsel during witness testimony and that Flax had, on occasion, departed from her usual practices when it came to evaluating C.D.  And as to the finding of inconsistencies, the record indicates, *inter alia*, that Flax failed to mention the purported inadequacies in the ACHIEVE program to Natick at any point during the Team meetings and that Dr. Imber wavered on appropriate services for C.D. during his testimony.  The court accordingly defers to the Hearing Officer's credibility determinations.

## ORDER

For the foregoing reasons, plaintiffs' and defendants' motions for summary judgment are <u>DENIED</u>.  The BSEA's cross-motions for summary judgment are <u>ALLOWED</u>.  The Clerk will enter judgment affirming the BSEA decision and close the case.

SO ORDERED.

/s/ Richard G. Stearns_____
UNITED STATES DISTRICT JUDGE